**NATIONAL TREASURY EMPLOYEES UNION, Appellant,**

v.

**Richard M. NIXON, Individually and as President of the United States.**

**No. 72–1929.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 7, 1973.

Decided Jan. 25, 1974.

George H. Cohen, Washington, D. C., with whom Robert M. Tobias, Washington, D. C., was on the brief for appellant.

Eloise E. Davies, Atty., Dept. of Justice, with whom Harold H. Titus, Jr., U.

S. Atty. and Morton Hollander, Atty., Dept. of Justice, were on the brief for appellee.

Before ROBINSON and WILKEY, Circuit Judges, and KAUFMAN,* United States District Judge for the District of Maryland.

FRANK A. KAUFMAN, District Judge:

At the last term on the affidavits then read and filed with the clerk, a rule was granted in this case, requiring the secretary of state to show cause why a mandamus should not issue, directing him to deliver to William Marbury his commission as a justice of the peace for the county of Washington, in the District of Columbia.

No cause has been shown, and the present motion is for a mandamus. The peculiar delicacy of this case, the novelty of some of its circumstances, and the real difficulty attending the points which occur in it, require a complete exposition of the principles on which the opinion to be given by the court is founded.

These principles have been, on the side of the applicant very ably argued at the bar. In rendering the opinion of the court, there will be some departure in form, though not in substance, from the points stated in that argument.

In the order in which the court has viewed this subject, the following questions have been considered and decided.

1st. Has the applicant a right to the commission he demands?

2d. If he has a right, and that right has been violated, do the laws of his country afford him a remedy?

3d. If they do afford him a remedy, is it a mandamus issuing from this court?

Those words, written in February, 1803, comprise the opening paragraphs of Mr.

---

* Sitting by designation pursuant to 28 U.S.C. § 292(c).

Chief Justice John Marshall's landmark opinion in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 154, 2 L.Ed. 60 (1803). The Chief Justice, writing for a unanimous Court, answered the first two questions in the affirmative,[1] concluding with regard to the first question:

> To withhold his commission, therefore, is an act deemed by the court not warranted by law, but violative of a vested legal right. [*Id.* at 162.]

Justice Marshall's discussion of the second question included the following:

> The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court. [*Id.* at 163.]

> \* \* \* \* \* \*

> It follows, then, that the question, whether the legality of an act of the head of a department be examinable in a court of justice or not, must always depend on the nature of that act.

> If some acts be examinable, and others not, there must be some rule of law to guide the court in the exercise of its jurisdiction.

> In some instances there may be difficulty in applying the rule to particular cases; but there cannot, it is believed, be much difficulty in laying down the rule.

> By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority, and in conformity with his orders.

> In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being intrusted to the executive, the decision of the executive is conclusive. The application of this remark will be perceived by adverting to the act of congress for establishing the department of foreign affairs. This officer, as his duties were prescribed by that act, is to conform precisely to the will of the President. He is the mere organ by whom that will is communicated. The acts of such an officer, as an officer, can never be examinable by the courts.

> But when the legislature proceeds to impose on that officer other duties; when he is directed peremptorily to perform certain acts; when the rights of individuals are dependent on the performance of those acts; he is so far the officer of the law; is amenable to the laws for his conduct; and cannot at his discretion sport away the vested rights of others.

> The conclusion from this reasoning is, that where the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable. But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a

---

**1.** The third question was answered in the negative—that is, the Supreme Court determined that it, as the court of original jurisdiction in the case before it, could not issue a writ of mandamus even though a lower federal court could so do.

right to resort to the laws of his country for a remedy. [*Id.* at 165–166.]

\* \* \* \* \* \*

It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing a mandamus is to be determined. Where the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is again repeated, that any application to a court to control, in any respect, his conduct would be rejected without hesitation.

But where he is directed by law to do a certain act affecting the absolute rights of individuals, in the performance of which he is not placed under the particular direction of the President, and the performance of which the President cannot lawfully forbid, and therefore is never presumed to have forbidden; as for example, to record a commission, or a patent for land, which has received all the legal solemnities; or to give a copy of such record; in such cases, it is not perceived on what ground the courts of the country are further excused from the duty of giving judgment that right be done to an injured individual, than if the same services were to be performed by a person not the head of a department. [*Id.* at 170–171.]

The third question in Marbury v. Madison, relating to the existence of the mandamus powers of the Supreme Court of the United States, is not present in this case, in which the National Treasury Employees Union (NTEU), a public employee union, seeks declaratory and injunctive relief and mandamus to require President Nixon to perform what is alleged to be a ministerial act under the Federal Pay Comparability Act (FPCA), 5 U.S.C. § 5301 et seq. (1970) NTEU filed this suit in the United States District Court for the District of Columbia, contending that under Section 5305(a) of the FPCA[2] the President

2. 5 U.S.C. § 5305(a)–(c) (1970) provides in relevant part:

§ 5305. *Annual pay reports and adjustments*

(a) In order to carry out the policy stated in section 5301 of this title, the President shall—

(1) direct such agent as he considers appropriate to prepare and submit to him annually, after considering such views and recommendations as may be submitted under the provisions of subsection (b) of this section, a report that—

(A) compares the rates of pay of the statutory pay systems with the rates of pay for the same levels of work in private enterprise as determined on the basis of appropriate annual surveys that shall be conducted by the Bureau of Labor Statistics;

(B) makes recommendations for appropriate adjustments in rates of pay; and

(C) includes the views and recommendations submitted under the provisions of subsection (b) of this section;

(2) after considering the report of his agent and the findings and recommendations of the Advisory Committee on Federal Pay reported to him under section 5306(b)(3) of this title, adjust the rates of pay of each statutory pay system in accordance with the principles under section 5301(a) of this title, effective as of the beginning of the first applicable pay period commencing on or after October 1 of the applicable year; and

(3) transmit to Congress a report of the pay adjustment, together with a copy of the report submitted to him by his agent and the findings and recommendations of the Advisory Committee on Federal Pay reported to him under section 5306(b)(3) of this title.

\* \* \* \* \*

(c)(1) If, because of national emergency or economic conditions affecting the general welfare, the President should, in any year, consider it inappropriate to make the pay adjustment required by subsection (a) of this section, he shall prepare and transmit to Congress before September 1 of that year such alternative plan with respect to a pay adjustment as he considers appropriate, together with the reasons therefore, in lieu of the pay adjustments required by subsection (a) of this section.

(2) An alternative plan transmitted by the President under paragraph (1) of this subsection becomes effective on the first day of the first applicable pay period commencing on or after October 1 of the applicable year and continues in effect unless, before the end of the first period of 30 calendar days of continuous session of Congress after the date on which the al-

was required to implement a comparability pay adjustment for federal employees effective in October, 1972, or to have submitted to the Congress by September 1, 1972 an alternative plan concerning federal pay adjustments; and that President Nixon without legal justification failed to take either course of action. NTEU, on September 14, 1972, originally filed a motion for a preliminary injunction. The District Court dismissed the complaint for lack of jurisdiction, referring to the separation of powers doctrine and also stating that in this case the President's performance of his duty depends upon the "construction and application" of the statutes involved. NTEU continues to seek injunctive, declaratory and mandamus relief herein.

■ Jurisdiction was originally asserted by NTEU under 28 U.S.C. § 1331(a),[3] § 1361[4] and § 2201.[5] However, in oral argument in this Court, counsel for NTEU admitted that Section 1331(a) jurisdiction is lacking because no individual plaintiff has a claim which exceeds $10,000. Thus, since aggregation of individual claims is not permitted under Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969)[6] for purposes of meeting the $10,000 requirement, Section 1331(a) jurisdiction is lacking herein. Accordingly, subject matter jurisdiction exists

only if NTEU has stated a proper claim for mandamus under Section 1361 measured by traditional criteria.

In this case, the same issues posed by the first two of the three questions presented to and answered by Mr. Chief Justice Marshall more than 170 years ago are present, with one most important difference—in this case the President of the United States, not the Secretary of State as in Marbury v. Madison, is the defendant. Precisely put, the two questions raised in this case are:

1. Were the members of plaintiff organization entitled to have the President put into effect their pay raise, as of October, 1972?

2. If the answer to that first question is "Yes", do the laws of this country afford plaintiff a remedy in this case in this Court?

I

Enacted on January 8, 1971, the FPCA departed from the previously established congressional pattern of dealing ad hoc with federal pay adjustments from time to time and provided a mechanism pursuant to which pay rates for federal employees are adjusted by the President[7] in October of each year beginning in 1972 based upon a survey conducted by the Bureau of Labor Statistics (BLS) relating federal pay scales

---

ternative plan is transmitted, either House adopts a resolution disapproving the alternative plan so recommended and submitted, in which case the pay adjustments for the statutory pay systems shall be made effective as provided by subsection (m) of this section. The continuity of a session is broken only by an adjournment of the Congress sine die, and the days on which either House is not in session because of an adjournment of more than 3 days to a day certain are excluded in the computation of the 30-day period.

 * * * * *

3. 28 U.S.C. § 1331(a) (1970) provides:
 (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

4. 28 U.S.C. § 1361 (1970) provides:
 The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

5. See n. 64, infra. It should be noted at the outset that Section 2201 does not by itself confer subject matter federal jurisdiction. See the discussion at p. 616, infra.

6. See also Zahn v. Int'l Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973).

7. Under 3 U.S.C. § 301 (1970), the President was empowered to delegate his duties under the FPCA to adjust federal pay scales to certain executive officials, but has not so done.

to rates of pay for the comparable levels of work in private enterprise.[8] One of the purposes behind the annual October adjustments was to reduce as far as possible the time lag between changes in pay rates in private industry and the corresponding adjustments of federal pay rates.[9] October was chosen as the adjustment month because it was deemed the earliest practicable time for an adjustment based upon the annual BLS survey.[10] However, Congress provided that the initial two pay adjustments under the FPCA based upon the 1970 and 1971 BLS surveys were not to take effect until the first applicable pay period beginning on or after January 1, 1971 and January 1, 1972, respectively.[11]

The FPCA requires the President, before he effectuates any pay adjustments under it, to appoint an agent [12] to compare federal pay rates with comparable private enterprise rates on the basis of annual BLS surveys and to make recommendations for appropriate federal pay adjustments.[13] The agent's recommendations are to include the views of a five-member Federal Employees Pay Council, composed of representatives of employee organizations, and are to be reviewed by a three-member Advisory Committee on Federal Pay, composed of labor management experts.[14] After considering the agent's report and the findings and recommendations of the Advisory Committee on Federal Pay, the President is required to adjust federal pay rates to make them comparable with private enterprise rates.[15] Additionally, however, Congress provided that in case of "national emergency or economic conditions affecting the general welfare", causing the President to consider it inappropriate to effectuate the pay adjustments in any year as required by Section 5305(a), the President may submit an alternative plan regarding pay adjustments to Congress before September 1 of that year together with his statement of the reasons therefor.[16] Such an alternative plan can be overridden with-

8. Under 5 U.S.C. § 5305(c)(1) (1970), federal pay adjustments were to occur each year beginning in 1972 on the first applicable pay period commencing on or after October 1. Hereinafter, those adjustments will be designated as occurring in October of the applicable year.

9. The new procedures required by H.R. 1300 would drastically reduce the long time lags that are built into the present Federal salary comparability system. By giving the President authority to increase pay for Federal employees the time lag would be cut from the normal year & a half we now experience to about six months.
Senator Fong, Cong.Rec., Vol. 116, Part 33, p. 44097 (91st Cong., 2d Sess.) (1970). *See also* S.Rep.No.91–582, 3 U.S.Code Cong. & Admin.News pp. 5916–5917 (91st Cong., 2d Sess. 1970).

10. *See* Cong.Rec., Vol. 116, Part 33, p. 44096 (91st Cong., 2d Sess. 1970).

11. *See* 84 Stat. 1951–1952, providing:
 (c) The President may make the initial adjustment required by subchapter I of chapter 53 of title 5, United States Code, as amended by this Act, without regard to the provisions of such subchapter relating to the Advisory Committee on Federal Pay and the Federal Employees Pay Council. Notwithstanding any provision of such subchapter I prescribing an effective date of October 1 for any pay adjustment made by the President, the initial adjustment based on the 1970 Bureau of Labor Statistics survey and the adjustment based on the 1971 Bureau of Labor Statistics survey shall become effective on the first day of the first applicable pay period that begins on or after January 1, 1971, and January 1, 1972, respectively. Notwithstanding the provisions of such subchapter I, the President's agent for purposes of the 1971 and 1972 adjustments shall be the Director, Office of Management and Budget and the Chairman, United States Civil Service Commission. Adjustments under the provisions of such subchapter I shall not apply to employees of the Post Office Department whose basic pay is fixed under the General Schedule.

12. Congress specified that for the 1971 and 1972 pay adjustments, the Director, Office of Management and Budget, and the Chairman, United States Civil Service Commission were to be the President's agent. *Id.*

13. 5 U.S.C. § 5305(a) (1970).

14. 5 U.S.C. §§ 5305(a)–(b), 5306 (1970).

15. 5 U.S.C. §§ 5305(a)(2), 5301(a)(3) (1970).

16. 5 U.S.C. § 5305(c)(1) (1970).

in a 30-day period by a resolution of either House of the Congress.[17] If not so overridden, the alternative plan takes effect on the expiration of the said 30-day period. If an alternative plan is overridden by either House, then the President is required to adjust federal pay scales in accord with Section 5305(a)(2).[18]

Congress enacted the FPCA approximately five months after it enacted on August 15, 1970 the Economic Stabilization Act, 12 U.S.C. § 1904 (1970 Ed.), (ESA) giving the President authority to issue orders and regulations to stabilize prices, rents, wages and salaries. On August 15, 1971, acting under authority of the ESA (as extended by Pub.Law 92–15, 85 Stat. 38, May 19, 1971), the President ordered a 90-day freeze on all prices, rents, salaries and wages and established the Cost of Living Council with the responsibility for recommending a course of action after the expiration of the 90-day freeze. (Executive Order 11615, 36 Fed.Reg. 15727).[19] On September 1, 1971, the President submitted an alternative plan to the Congress for adjustment of federal pay scales under 5 U.S.C. § 5305(c)(1) (1970) recommending a delay in scheduled pay increases from January 1, 1972 to July 1, 1972. After summarizing his August 15, 1971 actions and calling upon federal employees to aid the Federal Government in fighting inflation, the President's September 1, 1971 message to Congress stated:

> Therefore, in consideration of the economic conditions affecting the general welfare, I hereby transmit to the Congress the following alternative plan, as authorized and required by section 5305(c)(1) of title 5, United States Code:

> Such adjustments in the rates of pay of each Federal statutory pay system as may be *required*, based on the 1971 Bureau of Labor Statistics survey, shall become effective on the first day of the first applicable pay period that begins on or after July 1, 1972.

> I recognize that delaying the scheduled January 1972 increase to July 1972 means that two increases will then become due within a period of approximately three months. Since I am unable to predict whether two increases in such a relatively short time span will have a damaging effect on the economy, I am not prepared to make a decision with respect to the October 1972 increase at this time. After reviewing the economic situation during the first half of 1972, I will give serious consideration to the need for an alternative plan to that *scheduled* increase. If I conclude that an alternative plan is necessary I will, in accordance with the aforementioned provision of law, submit such a plan to Congress before September 1, 1972. It appears highly unlikely that any such plan would involve a postponement of the October 1972 adjustments beyond January 1973. [Emphasis supplied.]

The President's September 1, 1971 message seemingly acknowledged that he was required to proceed under the FPCA, 5 U.S.C. § 5305(c)(1) (1970), notwithstanding the ESA, if he desired to alter the scheduled federal pay increases under Section 5305(a)(2). That message also recognized that the effect

---

17. 5 U.S.C. § 5305(c)(2) (1970).

18. 5 U.S.C. § 5305(m) (1970) provides:
 (m) If either House adopts a resolution disapproving an alternative plan submitted under subsection (c) of this section, the President shall take the action required by paragraphs (2) and (3) of subsection (a) of this section and adjust the rates of pay of the statutory pay systems effective as of the beginning of the first applicable pay period commencing on or after the date on which the resolution is adopted, or on or after October 1, whichever is later.

19. In November, 1971, the Cost of Living Council, created by the President pursuant to his Executive Order 11615, exempted Federal Government employee pay adjustments from coverage of its order and regulations. 6 C.F.R. § 101.35.

of any alternative plan would be to schedule two pay comparability increases within three months—in July, 1972 and again in October, 1972—and that he would give "serious consideration" to submission to the Congress of another alternative plan before September 1, 1972 with regard to the scheduled October, 1972 pay adjustments. Neither House of Congress overrode the President's September 1, 1971 alternative plan under Section 5305(m).[20]

On December 22, 1971, however, Congress, by statute, overrode and wiped away the President's September 1, 1971 alternative plan by passing Section 3 of the ESA Amendments, 85 Stat. 753 (1971) which reestablished the January, 1972 date for federal pay adjustments under the FPCA based upon the 1971 BLS survey.[21]

■ On August 31, 1972 the President sent another message to Congress stating that Section 3 of the ESA Amendments required that any federal pay adjustments under the FPCA be delayed until January, 1973 and at the same time noting that the necessary 1972 pay comparability studies under the FPCA had been completed. The President's August 31, 1972 message stated in relevant part:

As we approach the October date on which pay rates for Federal employees under the statutory pay systems would

normally be adjusted, I wish to advise the Congress that I will recommend a pay increase for Federal employees effective January 1, 1973. I believe it is appropriate to point out that section 3 of Public Law 92–210, the Economic Stabilization Act Amendments of 1971, requires that this adjustment this year be delayed until January 1973.

The pay raise required by section 3 of the Economic Stabilization Act Amendments was limited by the terms of the law to the guideline that the Pay Board has established for pay increases throughout the economy, 5.5 percent a year. Clearly it was the intent of this law to see that Federal employees would be treated in a comparable manner with private enterprise employees under the Economic Stabilization Program. In recognition of this intent, on January 11, 1972, I directed that Federal wage employees should also have their pay increase limited by the Pay Board guidelines.

The necessary comparability studies have been completed and, under the Federal Pay Comparability Act of 1970, I will recommend that the increase necessary to achieve comparability, be paid, starting January 1, 1973, the first date our employees will be eligible to receive an increase under the Economic Stabilization Act.

**20.** *See* H.R. 596, 92nd Cong., 1st Sess., Sept. 15, 1971, and S.R.169, 92nd Cong., 1st Sess., Oct. 7, 1971. Both resolutions were defeated. Cong.Rec.H.11053 (daily ed. Nov. 15, 1971); Cong.Rec.S.19738 (daily ed. Nov. 29, 1971).

**21.** Section 3 provides:

Notwithstanding any provision of section 3(c) of the Federal Pay Comparability Act of 1970 (Public Law 91–656), or of section 5305 of title 5, United States Code, as added by section 3(a) of Public Law 91–656, and the provisions of the alternative plan submitted by the President to the Congress pursuant thereto on August 31, 1971, such comparability adjustments in the rates of pay of each Federal statutory pay system as may be required under such sections 5305 and 3(c), based

on the 1971 Bureau of Labor Statistics survey—

(1) shall not be greater than the guidelines established for the wage and salary adjustments for the private sector that may be authorized under authority of any statute of the United States, including the Economic Stabilization Act of 1970 (Public Law 91–379; 84 Stat. 799), as amended, and that may be in effect on December 31, 1971; and

(2) shall be placed into effect on the first day of the first pay period that begins on or after January 1, 1972. Nothing in this section shall be construed to provide any adjustments in rates of pay of any Federal statutory pay system which are greater than the adjustments based on the 1971 Bureau of Labor Statistics survey.

Our employees received their full 5.5 percent annual increase last January, and therefore their next increase cannot be effective until January 1, 1973. The provisions of Public Law 92–210 preclude submission of an alternative plan under section 5305(c)(1) of title 5, United States Code.

Thus, the President stated in his August 31, 1972 message to Congress that the necessary comparability studies under the FPCA relevant to the October, 1972 pay adjustments had been completed. The Government does not contend in this case that any reports, findings or recommendations as may have been required under Section 5305 to be submitted to the President before he adjusted pay under that section had not been submitted or that any other pre-condition to his adjustment of pay in October, 1972 had not been fulfilled. For the reasons stated in his August 31, 1972 message, the President neither adjusted federal pay scales under the FPCA in October, 1972 nor submitted an alternative plan under Section 5305(m) subject to disapproval by either House of Congress. In this lawsuit, the President's only asserted justification for failing to adjust on October 1, 1972 federal pay scales in accord with the FPCA is Section 3 of the ESA Amendments.[22] Herein, the Government contends that Section 3 [23] was intended to override the FPCA insofar as that Act scheduled federal pay increases during the calendar year 1972 exceeding 5.5%, the annual guideline for private sector wage and salary adjustments established by the Pay Board to take effect on and after November 14, 1971.[24] Because the President implemented a 5.5% pay increase for federal civilian and military employees effective

in January, 1972, the Government contends that Section 3 of the ESA Amendments dictated that no further federal pay increases be implemented during the calendar year 1972, notwithstanding the October, 1972 increase scheduled to take effect under the FPCA. However, both the statutory language of Section 3 and its legislative history compel an opposite conclusion, namely, the conclusion that Section 3 did not preclude the October, 1972 pay adjustment scheduled under the FPCA and that the President erred in failing to adjust federal pay on that date under 5 U.S.C. § 5305(a)(2).

The relatively clear meaning of Section 3 of the ESA Amendments seems to be the following: Notwithstanding Section 3(c) of the FPCA and the President's alternative plan submitted on August 31, 1971, such federal pay comparability adjustment, if any, as required under Section 3(c) of the FPCA for January, 1972, based upon the 1971 BLS survey, shall be placed into effect in January, 1972; provided, however, that no January, 1972 pay adjustment shall either exceed 5.5% (the ESA wage and salary guidelines in effect on December 1, 1971) or the pay adjustments based upon the 1971 BLS survey.[25] Section 3 of the ESA Amendments thus placed a ceiling of 5.5% on the January, 1972 federal pay increase. It seems clear, however, that Section 3 did not affect any pay adjustments under the FPCA other than those based on the 1971 BLS survey. Those adjustments based on the 1971 BLS survey were scheduled to become effective in January, 1972. The FPCA adjustment scheduled for October, 1972 would have been based on the 1972 BLS survey. Thus, the language of Section 3 indicates it was inapplicable

---

22. In January, 1973, the President adjusted federal pay scales upward 5.14%. The agent's report under the FPCA stated that such increase was needed to achieve comparability with private pay scales based upon the 1972 BLS survey. *See* Message from the President of the United States, referred to the Committee on Post Office and Civil Service, Jan. 9, 1973, H.Doc.No.93–40, 93rd Cong., 1st Sess. (1973).

23. Set forth at n. 21 *supra*.

24. Pay Board Regulations, 6 C.F.R. § 201.10, 36 Fed.Reg. 25428 (Dec. 31, 1971).

25. A 6.6% pay adjustment was recommended under the 1971 BLS survey. *See* Message from the President of the United States referred to the Committee on Post Office and Civil Service, Aug. 31, 1972, H.Doc.No.92–332, 92nd Cong., 2d Sess. (1972).

to the October, 1972 pay adjustment at issue in this case and does not justify the President's noncompliance with the requirements of the FPCA in October, 1972.

This construction of Section 3 is not necessarily inconsistent with the anti-inflation policies of the ESA. The President had power under the FPCA until September 1, 1972 to submit to Congress an alternative plan to delay or otherwise change the scheduled October, 1972 pay adjustments under that Act if he deemed "economic conditions" so required; and Congress presumably would not have overridden that plan if, in its opinion, so to do would substantially have furthered inflation.

The legislative history of Section 3 itself, although not entirely clear, also indicates on balance a congressional intent to leave unaffected by that section the October, 1972 pay adjustments scheduled under the FPCA. What became Section 3 of the ESA Amendments first appeared as a bill (S.2722) sponsored by Senator Fong and reported out of the Senate Post Office and Civil Service Committee on November 8, 1971 to accelerate the July, 1972 scheduled federal pay increase under the President's alternative plan submitted on August 31, 1971 and not disapproved, to January, 1972.[26] While that bill awaited floor action, the bill to amend the ESA of 1970 (S.2891) came before the Senate. Senator McGee, Chairman of the Senate Post Office and Civil Service Committee, thereupon introduced his Amendment 757, identical to Senator Fong's bill, as an amendment of S. 2891 and that amendment subsequently became Section 3 of the ESA Amendments.[27] The House version of the ESA Amendment bill included no comparable provision to Senator McGee's Amendment 757, but the Conference Committee adopted the Senate provision.[28]

In the course of the Senate discussion concerning what ultimately became Section 3 of the ESA Amendments, Senator Fong stated:

The President's Pay Board has not taken jurisdiction over Federal employees salary increases and the President has no authority under the law to rescind his Federal pay delay order.

Enactment of this amendment would mean that Federal employees would receive the pay increases justified by the Bureau of Labor Statistics survey figures but not higher than 5.5 percent effective January 1, 1972.

The amendment is justified on the basis of equity—treating Federal and non-Federal employees alike under phase II—and on the basis of comparability since the Bureau of Labor Statistics survey shows that there is a definite lag of Federal pay of at least 5.5 percent behind non-Federal pay. Cong.Rec.S.19739 (daily ed. Nov. 29, 1971).

Shortly thereafter the following colloquy occurred between Senator Sparkman and Senator McGee concerning the effect of what became Section 3 on future pay adjustments scheduled under the FPCA:

MR. SPARKMAN. * * * This does not have any effect on any of the future so-called automatic rises.

MR. McGEE. No.

MR. SPARKMAN. Each one of them came up by reason of the expiration of the law already in effect.

MR. McGEE. Then the law on the books would operate automatically in the future, unless the President declared an emergency again.

MR. SPARKMAN. As I understand the law, if the trigger works then the President can provide against

---

26. A substantially similar bill (H.R.10881) was introduced in the House of Representatives (92nd Cong., 1st Sess.).

27. *See* Cong.Rec.S.19738–42 (daily ed. Nov. 29, 1971).

28. *See* Cong.Rec.H.12362 (daily ed. Dec. 13, 1971).

it and then, it is up to Congress whether or not it will support—·

MR. McGEE. That is right. The President can submit an alternative.

MR. SPARKMAN. Yes. But Congress has the power to make the determination.

MR. McGEE. The ultimate determination.

MR. SPARKMAN. And this language does not affect that in the least.

MR. McGEE. Not in the least. Cong.Rec.S.19739 (daily ed. Nov. 29, 1971).

The Report of the Senate-House Conference Committee refers as follows to the meaning of Section 3:

The Senate bill contained a provision which authorizes comparability adjustments in the rates of pay of each Federal pay system covered by the Federal Pay Comparability Act of 1970, to be placed into effect on the first day of the first pay period that begins on or after January 1, 1972, notwithstanding the provisions of the alternative pay plan submitted by the President to the Congress on August 31, 1971. The amount of such increases may not exceed the 5.5 percent ceiling established as a guideline by the Pay Board. The House bill contained no such provision. The conferees adopted the Senate provision with a clarifying amendment. [Cong.Rec. H.12362 (daily ed. Dec. 13, 1971).]

After the Conference Report had been submitted to both Houses of Congress, the meaning of Section 3 was specifically discussed by members of both the House and the Senate. In the House, the following colloquy occurred between Mr. Ford, the House Minority Leader, and Mr. Widnall: ·

MR. GERALD R. FORD. Mr. Speaker, I think it is important to clarify the effect of the Pay Board amendment to the legislation before us, to ask the distinguished gentleman from New Jersey if the 5½ percent increase is on an annual basis?

MR. WIDNALL. In answer to your question—yes—the objective of this amendment is to treat Government employees the same as employees in the private sector.

The Pay Board has promulgated a 5½ percent annual guideline and, therefore, for the calendar year 1972 Federal employees will receive a 5½ percent increase under this amendment and there will be no October 1, 1972, pay adjustment. [Cong.Rec.H. 12526 (daily ed. Dec. 14, 1971).]

The above colloquy was followed by a discussion between Mr. Udall and Mr. Widnall:

MR. UDALL. Mr. Speaker, the hour is late and I am not sure I understand everything here. Is the gentleman from New Jersey suggesting that the language in this [conference] report rules out the October 1972 pay raise for Federal employees which is scheduled under permanent law and under the Bureau of Labor Statistics comparability studies?

MR. WIDNALL. It is the intent of this report and this conference that in the calendar year the 5½ percent increase will go into effect, but there will be no October 1972 pay adjustment.

MR. UDALL. If the gentleman will yield further, is that adjustment postponed to a specific date?

MR. WIDNALL. It is not.

MR. UDALL. So the intent is that we shall simply jump the comparability system in 1972. Is that the effect of it?

MR. WIDNALL. That all depends upon whether or not the Members of the House want to effect a further increase aside from the guidelines. [*Id.*]

Mr. Ford and Mr. Widnall's interpretation of Section 3 was quickly questioned by Mr. Udall and Mr. St. Germain. With regard to the question of

whether Section 3 was intended to bar any October, 1972 pay increase under the FPCA, Mr. St. Germain stated:

I believe I was present in the conference at every moment of the conference. This question never came up in the conference. There is nothing in the statement of the managers and there is nothing in the conference report that has any reference to this subject whatsoever. Therefore, I do not understand. Maybe this is an interpretation that the gentleman from New Jersey gets from the Senate side, but as far as the conference is concerned, as far as the conference report is concerned, and as far as the statement of the managers is concerned, there is not one period, comma, or preposition referring to this matter. [*Id.*]

Thereafter, Mr. Patman in response to a question from Mr. Udall indicated that Section 3 had no application to the October, 1972 pay adjustments under the FPCA.

MR. UDALL. Therefore, it is correct to say that the conference committee never discussed and never intended to legislate on next year's pay raises or the October 1972 pay raises. You were dealing only with the January 1972 Federal pay raises?

MR. PATMAN. That is correct. [*Id.* at H. 12530.]

During the Senate debate concerning the pay increases authorized by Section 3, Senator Sparkman, a conferee, caused the following question and answer to be inserted into the record:

Q. In order to clarify the effect of the Fong-McGee Amendment to the Economic Stabilization Act, let me ask you if the 5½ percent increase is on an annual basis.

A. Yes. The objective of this amendment is to treat government employees the same as employees in the private sector. The Pay Board has promulgated 5½ percent annual guidelines. Therefore, for the calendar year 1972, Federal employees will receive a 5½ percent increase under this Amendment.

[Cong.Rec.S.21583 (daily ed. Dec. 13, 1971).]

Soon thereafter, however, Senator McGee, who had offered the amendment, placed these remarks in the record to refute any statements made by Representatives Ford and Widnall and Senator Sparkman indicating that Section 3 by itself limited federal employees to a 5.5% wage or salary increase for the entire calendar year of 1972 and expressly stating that Section 3 did not affect the October, 1972 pay adjustment scheduled under the FPCA:

MR. McGEE. Mr. President, the passage of the Economic Stabilization Act—the phase II bill—includes language requiring an increase in Federal salaries generally related to the 5.5 percent pay increase authorized for employees in the private sector of the economy. I sponsored the Senate amendment which made that increase possible, and I was glad that the Senate, by a near unanimous vote, approved the amendment; and that the House concurred with the Senate provision.

Unfortunately, there have been two brief discussions on the floor of the Senate and the House of Representatives which have misrepresented just exactly what the language of the McGee amendment does, or does not do. And so, as *the author of the amendment, as well as the chairman of the Committee on Post Office and Civil Service,* I should like to clarify precisely what the bill does so that any officials in the executive branch who are responsible for the administration of Federal pay will not be led to believe that the language of Public Law 91–656 has somehow been replaced by a colloquy between Members of Congress.

\* \* \* \* \* \*

Because of the establishment of a 5.5 percent wage increase guideline for the private sector of the economy, and

also because of several significant exceptions made by the Pay Board, the Senate voted to make the Federal employees' [FPCA] increase effective January 1, 1972, thus overriding the President's alternate plan.

\* \* \* \* \* \*

The colloquy on the floor of the Senate and House which raised some questions relates to the effect, if any, which the January increase will have upon the next comparability increase authorized by Public Law 91–656. I ask unanimous consent to have printed at this point in the RECORD a portion of the CONGRESSIONAL RECORD for Tuesday, December 14, 1971, relating to the effect of this increase.

\* \* \* \* \* \*

Mr. President, with all due respect to my colleagues in the House of Representatives who engaged in this conversation, I must point out that the conclusion they reached is not accurate. The language of the law, Public Law 91–656, specifically provides that there shall be a 1972 salary adjustment in accordance with the BLS survey, to be made effective on the first day of the first pay period beginning on or after October 1, 1972. *The only method by which that increase can be changed,* delayed, modified, increased, or otherwise affected *is through the submission by the President of an alternative plan* to Congress not later than August 31, 1972. This procedure is spelled out in Public Law 91–656.

*The Federal employee pay increase for January 1, 1972, is related to employees in the private sector in the economy in one respect, and one respect only—that the wage increase for Federal employees may not exceed the 5.5 percent guideline established by the Pay Board. Otherwise, the pay of Federal employees is not affected.* The Cost of Living Council specifically exempted Federal salaries and Federal employees from any jurisdiction by that Pay Board because Federal employees are subject to another system, established by law, and subject to the power of the President to submit an alternate plan. I am sure that if such a plan is submitted next year, Congress will give the President's recommendations very careful consideration. [Cong. Rec. S. 21696–97 (daily ed. December 15, 1971).] [Emphases supplied.]

Senator McGee's statements concerning the meaning of Section 3 were the last ones made before final passage of the ESA Amendments by both the House and Senate on December 14, 1972.

▊ It thus appears that Representatives Ford and Widnall and Senator Sparkman thought that Section 3 of the ESA Amendments limited federal employees to a 5.5% wage or salary increase for the calendar year 1972 and thereby overrode the scheduled October, 1972 pay adjustment under the FPCA, whereas Senator McGee and Representatives Udall, Patman and St. Germain thought that Section 3 left unaffected the scheduled pay adjustment in October, 1972 under the FPCA. Because Senator McGee offered the amendment that became Section 3, his remarks concerning its meaning have at least some added importance. Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394–395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951). See First Nat'l Bank v. Walker Bank & Trust Co., 385 U.S. 252, 261, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966). It is true that Mr. Widnall and Mr. Sparkman were conferees; but so were Mr. Patman and Mr. St. Germain. Moreover, the last remarks concerning the meaning of Section 3 were those of Senator McGee in the Senate and Representatives Patman and Udall in the House. The somewhat muddled legislative history of Section 3 thus tends to support the conclusion that it had no application to the October, 1972 pay adjustment scheduled under the FPCA. In the light of that history, but more particularly because of the clear meaning of the words of the relevant statutes, this Court concludes that NTEU had the

right to have the President adjust federal pay scales under the FPCA in October, 1972 and that Congress had imposed upon the President the duty so to do.

The statutory language setting forth that duty is specific. Section 5305 states that the President "shall", after considering a certain report, findings and recommendations, "adjust the rates of pay of each statutory pay system in accordance with the principles under section 5301(a) of this title, effective as of the beginning of the first applicable pay period commencing on or after October 1 of the applicable year . . . ." Section 5305(c)(1) states that the President may submit an alternative plan "in lieu of the pay adjustments *required*" under Section 5305(a) (emphasis supplied). Section 3 of the ESA Amendments speaks of pay adjustments "as may be *required*" under Section 5305 (emphasis supplied). In two messages to Congress, the President himself referred to the pay adjustments under Section 5305(a) as "required" or as "scheduled increase[s]",[29] or as "automatic".[30] The legislative history of Section 5305 also indicates that once the necessary comparability studies are

completed and a certain report, findings and recommendations are sent to the President, the President has discretion not to adjust pay in accord with the dictates of Section 5305(a)(2) only if he has timely submitted an alternative plan to Congress.[31] And the legislative history of Section 3 of the ESA Amendments also indicates that Congress thought the pay adjustments under Section 5305 were mandatory and not permissive.[32]

■ In this case, the President failed to submit an alternative plan to Congress by September 1, 1972—a plan he was required to submit if he desired to change or delay the otherwise required pay adjustments mandated by Section 5305(a)(2) to become effective in October, 1972. After the President received the necessary comparability studies, his obligation to adjust pay under the FPCA was mandatory, involving no discretion. Therefore, the answer to the first question posed in this case, that is, "were the members of NTEU entitled to have the President of the United States put into effect their pay raise, as of October, 1972?" is "Yes". Accordingly, Question 2, that is, "do the laws of this

---

29. *See* p. 594 *supra.*

30. President Nixon stated in authorizing a 5.5% pay increase for federal civilian and military employees effective in January, 1972:

> The purpose of Section 3 of the Stabilization Act Amendments was to provide equal treatment for Federal employees and military personnel as compared with employees in the private sector who are subject to the Phase 2 pay guidelines. The raises I am implementing today do precisely that. Should a second raise be granted next October, Federal employees and military personnel would be receiving preferential treatment—raises in excess of the Phase 2 guidelines. That would be plainly inconsistent with the overall intention of the Congress, which is to relate Federal pay to the guidelines of the Pay Board.
>
> Therefore I am authorizing an annual increase consistent with these guidelines, interpreting the law to mean there will be no *automatic* October adjustment. [Emphasis added].

7 Presidential Documents 1703, Dec. 27, 1971.

31. The provision of the House version of the FPCA of 1970 which would have required approval by Congress before annual pay adjustments would become effective was rejected by the Conference Committee in favor of the Senate version of Section 5305(c)(1). The Committee described its action as follows:

> The greatest difference between H.R. 13000 as approved by the House on October 14, 1969, and the conference substitute is that under the latter the President is directed to make annual adjustments in the rates of pay, whereas under H.R. 13000 a Federal Employee Salary Commission was directed to submit recommended pay adjustments to the Congress which would become effective upon approval by Congress. [Cong.Rec.H.12589 (daily ed. Dec. 31, 1970).]

32. *See* Cong.Rec.S.19738 and S.19739 (daily ed. Nov. 29, 1971).

country afford plaintiff a remedy in this case in this Court?" requires an answer.

## II

■■ If the defendant were a federal official other than the President of the United States, Marbury v. Madison and an unbroken line of authority since 1803 would call for an unequivocal and quick affirmative answer to that Question 2 in this case. The writ of mandamus "* * * will issue only where the duty to be performed is ministerial and the obligation to act peremptory, and plainly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and indisputable." United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 420, 51 S.Ct. 502, 504, 75 L.Ed. 1148 (1931). Subject to that standard, a federal official, including a cabinet officer, is subject to the issuance of a writ of mandamus by a federal court. Kendall v. United States, 37 U.S. (12 Pet.) 524, 609 et seq., 9 L.Ed. 1181 (1838); Marbury v. Madison, 5 U.S. supra at 164–166.[33] The fact in and of itself that the President was required to interpret both the ESA Amendments and the FPCA before determining what his legal obligations were under the latter statute as regards the scheduled October, 1972 pay increase did not render his duty to effect an October, 1972 pay adjustment other than ministerial. In Wilbur v. United States ex rel. Krushnic, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930), the Secretary of the Interior was sued to compel the recognition of certain mining claims. After carefully analyzing the interrelationship between two statutes, the Court concluded that the Secretary's failure to recognize the respondent's mining claims was illegal and had occurred because "the Secretary interpreted and applied a statute in a way contrary to its explicit terms, and in so doing, departed from a plain official duty" (at 319, 50 S.Ct. at 105). In determining that the writ of mandamus should issue against the Secretary directing him in effect to recognize the respondent's claims, the Court, after noting that often a statute requires interpretation by the public officer whose duties may be defined therein, quoted (at 318–319, 50 S.Ct. at 105) the following passage from Roberts v. United States, 176 U.S. 219, 231, 20 S.Ct. 376, 44 L.Ed. 443 (1900):

* * *. Every statute to some extent requires construction by the public officer whose duties may be defined therein. Such officer must read the law, and he must therefore, in a certain sense, construe it, in order to form a judgment from its language what duty he is directed by the statute to perform. But that does not necessarily and in all cases make the duty of the officer anything other than a purely ministerial one. If the law direct him to perform an act in regard to which no discretion is committed to him, and which, upon the facts existing, he is bound to perform, then that act is ministerial, although depending upon a statute which requires, in some degree a construction of its language by the officer. Unless this be so, the value of this writ is very greatly impaired. Every executive officer whose duty is plainly devolved upon him by statute might refuse to perform it, and when his refusal is brought before the court he might successfully plead that the performance of the duty involved the con-

33. See also Panama Canal Co. v. Grace Lines, Inc., 356 U.S. 309, 317–318, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958); Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 218–222, 50 S.Ct. 320, 74 L.Ed. 809 (1930); Work v. United States ex rel. Rives, 267 U.S. 175, 177–178, 45 S.Ct. 252, 69 L.Ed. 561 (1925); Ballinger v. Frost, 216 U.S. 240, 249, 30 S.Ct. 338, 54 L.Ed. 464 (1910); Garfield v. United States ex rel. Goldsby, 211 U.S. 249, 29 S.Ct. 62, 53 L.Ed. 168 (1908); Roberts v. United States ex rel. Valentine, 176 U.S. 219, 229–231, 20 S.Ct. 376, 44 L.Ed. 443 (1900); United States v. Schurz, 102 U.S. 378, 26 L.Ed. 167 (1880); McGaw v. Farrow, 472 F.2d 952, 955–957 (4th Cir. 1973); Schwartz & Jacoby, Litigation with the Federal Government § 16.109, p. 279 (1970 ed.).

struction of a statute by him, and therefore it was not ministerial, and the court would on that account be powerless to give relief. Such a limitation of the powers of the court, we think, would be most unfortunate, as it would relieve from judicial supervision all executive officers in the performance of their duties, whenever they should plead that the duty required of them arose upon the construction of a statute, no matter how plain its language, nor how plainly they violated their duty in refusing to perform the act required.

■ The within case, despite the above-discussed different expressions offered upon the floor of the Congress concerning the meaning of the statutes involved, is not a case in which the duty of the President "depends upon a statute or statutes the construction or application of which is not free from doubt." Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 219, 50 S.Ct. 320, 324, 74 L.Ed. 809 (1930). In such a case there is presented a question "regarded as involving the character of judgment or discretion which cannot be controlled by mandamus." *Id.* In this case, there is no issue of "construction" or "application" of the relevant statutes which in this Court's opinion is doubtful; nor is this a case involving a statute pursuant to which "discretion extends to a final construction by the officer of the statute he is executing." Work v. United States ex rel. Rives, 267 U.S. 175, 177, 45 S.Ct. 252, 69 L.Ed. 561 (1925).[34] In sum, the duty imposed upon the President by the statutes involved in this case is one which is clearly prescribed and which, under traditional criteria, is a proper subject for mandamus relief in the face of nonperformance of such duty.

### Political Question

■ The Government suggests that the legal issue in this case is nonjusticiable on the ground that it presents a political question. We disagree. All that is involved in this case is interpretation of the interrelation of federal statutes concerning federal pay and determination of the President's duty under those statutes. Such interpretation and determination is the essence of judicial duty. "It is, emphatically, the province and duty of the judicial department, to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule." Marbury v. Madison, *supra* at 177 of 5 U.S.

The standards to be used to determine whether a claim is justiciable have been most recently set forth by the Supreme Court in Baker v. Carr, 369 U.S. 186, 208 et seq., 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and reaffirmed in Powell v. McCormack, 395 U.S. 486, 516, 548–549, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). In Baker v. Carr, after stating that the political question doctrine is grounded upon the separation of powers between the judiciary and the coordinate branches of the Federal Government, Mr. Justice Brennan wrote (at 217 of 369 U.S., at 710 of 82 S.Ct.):

\* \* \* Prominent on the surface of any case held to involve a political

---

34. \* \* \* Executive officers cannot \* \* \* create an area of doubt and dispute which will be outside the established power of the judiciary to compel obedience to a clear mandate of the Congress. They cannot by bootstraps manufactured by them lift themselves out of the jurisdiction of the courts. Clackamas County, Or. v. McKay, 94 U.S. App.D.C. 108, 219 F.2d 479, 495 (Prettyman, J.), vacated as moot, 349 U.S. 909, 75 S.Ct. 599, 99 L.Ed. 1244 (1955).

Some opinions state that the courts have authority to intervene when the duty of the executive officer is ministerial, in which event mandamus will lie. \* \* \* But the word "ministerial" is not sufficiently expressive to denote adequately every situation into which the courts may enter. Indeed, a duty often becomes ministerial only after a court has reached its own judgment about a disputable legal question and its application to a factual situation. \* \* \* [Citations and Footnotes omitted.] Seaton v. Texas Co., 103 U.S.App.D.C. 163, 256 F.2d 718, 723 (1958) (Fahy, J.)

question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.[35]

The factual issues presented in this case do not fit into any of the six contexts set forth by Mr. Justice Brennan.

■■■■■ (1) To begin with, nothing in the Constitution commits to the President the ultimate authority to construe federal statutes, at least when those statutes concern federal pay. Article II, Section 3 of the Constitution obligates the President to "take Care that the Laws be faithfully executed . . . ." That constitutional duty does not permit the President to refrain from executing laws duly enacted by the Congress as those laws are construed by the judiciary. Over 135 years ago, in Kendall v. United States, 37 U.S. (12 Pet.) *supra* at 613, a suit was brought against the Postmaster General to compel the payment of a certain sum of money for services performed in connection with the transportation of mail. Payment of the disputed sum was specifically provided for by an Act of Congress. The Postmaster General contended that he alone was subject to the direction and

control of the President with respect to the execution of the duty imposed upon him by the law in issue, which mandated the payments sought in the case, by virtue of the President's constitutional duty to execute faithfully the laws. The Supreme Court, in rejecting that contention, observed that its logical extension would give the President authority effectively to nullify Acts of Congress (at 612–613):

It was urged at the bar, that the Postmaster-General was alone subject to the direction and control of the President, with respect to the execution of the duty imposed upon him by this law; and this right of the President is claimed, as growing out of the obligation imposed upon him by the Constitution, to take care that the laws be faithfully executed. This is a doctrine that cannot receive the sanction of this court. It would be vesting in the president a dispensing power, which has no countenance for its support, in any part of the Constitution, and is asserting a principle, which, if carried out in its results, to all cases falling within it, would be clothing the president with a power entirely to control the legislation of Congress, and paralyze the administration of justice.

To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the Constitution, and entirely inadmissible. * * *

Thus, the judicial branch of the Federal Government has the constitutional duty of requiring the executive branch to remain within the limits stated by the legislative branch.[36]

---

35. For cases discussing the political question doctrine, *see also* Holtzman v. Schlesinger, 484 F.2d 1307 (2d Cir., 1973); State Highway Comm'n v. Volpe, 479 F.2d 1099 (8th Cir., 1973), Cumulative Report, Joint Comm. on Cong.Op. 93rd Cong., 1st Sess., 345, at 350–351 (1973); Massachusetts v. Laird, 451 F.2d 26 (1st Cir. 1971); Luftig v. Mc-

Namara, 126 U.S.App.D.C. 4, 373 F.2d 664 (1967), cert. denied sub nom., Mora v. McNamara, 389 U.S. 934, 88 S.Ct. 282, 19 L.Ed.2d 287 (1967); Atlee v. Laird, 347 F.Supp. 689 (E.D.Pa.1972), aff'd, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973).

36. *See* State Highway Comm'n v. Volpe, 479 F.2d 1099 (8th Cir. 1973) at 350–351 of

(2) There are not lacking judicially discoverable standards for resolving the dispute in this case. The interpretation of federal statutes makes up a large part of the day-to-day work of the federal judiciary and the standards used in making those interpretations are well developed and familiar.[37] Moreover, the remedy sought in this case is mandamus to compel the President to perform a single ministerial act and does not require any court supervision over the performance of duty by the executive branch.[38]

(3) The resolution of the issue in this case does not require initial policy determination of a kind clearly for nonjudicial discretion. Congress has set forth its policy concerning federal pay adjustments under the FPCA; this lawsuit merely seeks the implementation of that policy. The issue to be resolved in this case does not concern any matter of foreign policy or any use of the military forces in connection with which courts have often been reluctant to interfere.[39]

■■■ (4) The resolution of the issue in this case by this Court does not express any lack of respect due a coordinate branch of the Government. On the contrary, failure of a federal court to take jurisdiction over the issue not only might indicate a disrespect for congressional legislative authority under Article I, Section 1 of the Constitution, but itself might be constitutionally improper. Mr. Chief Justice Marshall stated in Cohens v. Virginia, 19 U.S. (6 Wheat) 264, 404, 5 L.Ed. 257 (1821):

It is most true, that this court will not take jurisdiction if it should not; but it is equally true, that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by, because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur, which we would gladly avoid, but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty. * * *

Moreover, judicial resolution of the issue better enables the President to perform his constitutional duty to take care that the laws be faithfully executed. No lack of respect is shown the executive merely because this Court has exercised its duty to interpret a statute differently than has the President. *See* Powell v. McCormack, *supra* 395 U.S. at 549, 89 S.Ct. 1944. Indeed, failure to determine the law because the executive has spoken would seem a nonperformance of duty by the judiciary. *See* United States v., Klein, 80 U.S. (13 Wall) 128, 143–147, 20 L.Ed. 519 (1872).

(5) Nor does this case pose an unusual need for unquestioning adherence to a political decision already made. The President apparently failed to adjust pay under the FPCA in October, 1972 because of an erroneous interpretation of the law. There is not present with regard to the issue herein concerning federal pay the type of unusual circumstances present when foreign relations or the conduct of hostilities are involved.

Cong.Rep. (cited *supra* at n. 35); Nat'l Automatic Laundry v. Shultz, 143 U.S. App.D.C. 274, 443 F.2d 689, 695 (1971).

37. *Cf.* Powell v. McCormack, *supra* at 549 of 395 U.S., 89 S.Ct. 1944; Baker v. Carr, *supra* at 226 of 369 U.S., 82 S.Ct. 691.

38. *Compare* Marbury v. Madison, *supra, with* Gilligan v. Morgan, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). *See also* Minnesota Chippewa Tribe v. Carlucci, 358 F. Supp. 973 (D.D.C., 1973).

39. *See* Gilligan v. Morgan, 413 U.S. 1, 93 S. Ct. 2440, 37 L.Ed.2d 407 (1973); Baker v. Carr, *supra* at 211–214 of 369 U.S., 82 S.Ct. 691; Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 18 L.Ed. 437 (1866); Atlee v. Laird, 347 F.Supp. 689 (E.D.Pa.1972), *aff'd,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973); Mitchell v. Laird, 158 U.S.App.D.C. 88, 476 F.2d 533 (1973). *See also* Holtzman v. Schlesinger, 484 F.2d 1307 (2d Cir., 1973).

(6) Lastly, the potential embarrassment to the President in having this Court exercise its duty in authoritatively placing a different interpretation than the President's on the FPCA and the ESA Amendments does not make that question of statutory interpretation nonjusticiable.[40] If that were the case, a President could render every legal issue "political" by publicly expressing his opinion on the same before that issue reached the courts. Thus, this case presents no nonjusticiable political question within the six factual contexts set forth in Baker v. Carr. And while it is possible to hypothesize factual contexts in addition to those framed by Mr. Justice Brennan in Baker v. Carr, in which a political question would be presented, none of them which have been suggested to this Court or which come to mind resemble the factual context of this case which simply involves an automatically required step by the President in pursuance of a precisely established congressional formula.

### Separation of Powers

It bears repeating that if the defendant were any one other than the President of the United States, there is little question but that NTEU would be entitled to have a writ of mandamus issue in this case. There is also little doubt that if it were possible for NTEU to enforce its rights by naming a defendant additional to or in substitution of the President, this Court would exercise its discretion not to answer the question of whether the President is subject to mandamus by a federal court to perform a purely ministerial duty. See the efforts of this Court aimed at "the objective of avoiding a needless constitutional adjudication." Nixon v. Sirica, 159 U.S.App.D.C. 58, 487 F.2d 700, p. 719 (1973). But that question cannot be sidestepped in this case.

Relying principally on Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 18 L.Ed. 437 (1866),[41] the District Court stated that one of the reasons why the complaint should be dismissed is because to permit the President to be sued in this case would violate the separation of powers doctrine. The Government in argument to this Court has also relied primarily on Mississippi v. Johnson.[42]

---

40. *See* Powell v. McCormack, *supra* at 548–549 of 395 U.S., 89 S.Ct. 1944.

41. The District Court also cited Trimble v. Johnston, 173 F.Supp. 651, 652 (D.D.C. 1959), and San Francisco Redevelopment Agency v. Nixon, 329 F.Supp. 672 (N.D.Cal. 1971), to support dismissal of the suit. In the latter case, suit was brought against the President seeking mandamus to compel the President to allot certain money appropriated by Congress. The District Court summarily dismissed the suit in a few paragraphs citing no authority except for Marbury v. Madison and stating that it could find no authority for the proposition that a federal court could compel the President to take any action whatsoever. In Trimble v. Johnston, a newspaper correspondent sued the Secretary of the Senate and other defendants seeking a mandatory injunction compelling the defendants to permit inspection of certain payroll records and other documents relevant to Senate disbursements. In dismissing the suit, the Court stated in dicta that courts could not restrain or compel the President to act (at 653 of 173 F.Supp.).

The Court cited Decatur v. Paulding, 39 U.S. (14 Pet.) 497, 10 L.Ed. 559 (1840), to support that statement. However, in that case, mandamus was sought against the Secretary of the Navy to compel payment of a pension pursuant to a federal statute. The Court dismissed the action on the ground that the Secretary had discretion to pay pensions under the statute and that thus jurisdiction over the suit was lacking since mandamus did not lie. Additionally, however, the Court noted that in an appropriate case the interpretation of the law by a department head would not be binding on the courts (at 515).

42. The Government has also cited Meyers v. Nixon, 339 F.Supp. 1388 (S.D.N.Y., 1972); Atlee v. Nixon, 336 F.Supp. 790 (E.D.Pa. 1972), and Suskin v. Nixon, 304 F.Supp. 71 (N.D.Ill., 1969), to support its contention that the doctrine of separation of powers bars this suit against the President. In *Meyers*, suit was brought against both the President and the Secretary of Defense seeking a permanent injunction, *inter alia*, against allocation and expenditures of federal funds to fi-

However, that case specifically left open the exact question to be determined in this case, *i. e.,* whether a court can compel the President to perform a ministerial act. In Mississippi v. Johnson, the State of Mississippi sought to enjoin President Andrew Johnson from executing, or in any manner carrying out, Acts of Congress commonly known as the Reconstruction Acts, on the ground that those Acts were unconstitutional. Mr. Chief Justice Chase, writing for a unanimous Court, stated that the case did not present the issue of whether the Court could compel the President to perform a ministerial act (at 498):

> We shall limit our inquiry to the question presented by the objection, without expressing any opinion on the broader issues discussed in argument, whether, in any case, the President of the United States may be required, by the process of this court, to perform a purely ministerial act under a positive law, or may be held amenable, in any case, otherwise than by impeachment for crime.

> The single point which requires consideration is this: Can the President be restrained by injunction from carrying into effect an act of Congress alleged to be unconstitutional?

The Court then explained what it meant by the word "ministerial" (at 498–499):

> It is assumed by the counsel for the state of Mississippi, that the President, in the execution of the Reconstruction Acts, is required to perform a mere ministerial duty. In this assumption there is, we think, a confounding of the terms "ministerial" and "executive," which are by no means equivalent in import.

> A ministerial duty, the performance of which may, in proper cases, be required of the head of a department, by judicial process, is one in respect

nance the war in Southeast Asia and declaratory relief holding that such expenditures were unconstitutional. The District Court dismissed the suit on the grounds that the plaintiffs lacked standing and that the suit presented a nonjusticiable political question. The District Court thus found it unnecessary to determine the issue of executive immunity, but expressed agreement with the views of Chief Judge Lord set forth in Atlee v. Nixon, *supra.* In *Atlee,* suit was brought against both the President and the Secretary of Defense seeking a permanent injunction against the expenditure of federal funds to prosecute the allegedly unconstitutional war in Southeast Asia. The Government "suggested" that the suit be dismissed as to the President under the doctrine of executive immunity. Specifically rejecting the contention that the President is immune from judicial process whatever the circumstances, Chief Judge Lord noted that the Secretary of Defense was also a defendant and thus concluded that the President should be dismissed as a party without prejudice to the rights of the plaintiffs to move to join him as a necessary party if the allegedly prohibited conduct appeared to be committed solely by the President. The question of whether the presidential immunity doctrine should apply in a situation where the President is alleged to be acting unconstitutionally and there is no agent who could be sued was specifically left open. The sequel to Atlee v.

Nixon is found in Atlee v. Laird, 347 F. Supp. 689 (E.D.Pa., 1972), aff'd, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973), in which Circuit Judge Adams, writing for the majority of a three-judge District Court, dismissed the suit against the Secretary of Defense on the ground that it presented a nonjusticiable political question. Chief Judge Lord dissented.

In Suskin v. Nixon, *supra,* suit was brought against the President, Attorney General John Mitchell and Director of the Selective Service System Lewis B. Hershey, seeking a declaration that certain provisions of the Military Selective Service Act of 1967 were unconstitutional. The Government suggested the action as to the President be dismissed. Chief Judge Robson dismissed the suit as to the President holding that his duties under the challenged statute were executive and discretionary in nature and thus not subject to judicial interference. The District Court also dismissed the action as to the other defendants finding that the alleged claim as to them was meritless. *Suskin* thus differs from this suit against the President in two important respects. First, in that case, other defendants were suable so that presidential immunity did not bar the judiciary from hearing the claim on the merits. Second, in that case, the President's duties under the challenged statute were found to be executive and discretionary rather than ministerial.

to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law.

The case of Marbury v. Madison, 1 Cranch, 137 [2 L.Ed. 60], furnishes an illustration. A citizen had been nominated, confirmed, and appointed a justice of the peace for the District of Columbia, and his commission had been made out, signed and sealed. Nothing remained to be done except delivery, and the duty of delivery was imposed by law on the Secretary of State. It was held that the performance of this duty might be enforced by manadamus issuing from a court having jurisdiction.

So, in the case of Kendall v. U. S., 12 Pet. [524] 527 [9 L.Ed. 1181], an act of Congress had directed the Postmaster-General to credit Stockton & Stokes with such sums as the solicitor of the Treasury should find due to them; and that officer refused to credit them with certain sums, so found due. It was held that the crediting of this money was a mere ministerial duty, the performance of which might be judicially enforced.

In each of these cases nothing was left to discretion. There was no room for the exercise of judgment. The law required the performance of a single specific act; and that performance, it was held, might be required by mandamus.

The Court concluded that the challenged Reconstruction Acts imposed purely "executive and political" duties upon the President and that a federal court lacked jurisdiction to enjoin the President from performing those duties.[43]

The leads to the answer to the question left open by the Supreme Court in Mississippi v. Johnson as to whether a President can be mandamused to perform a ministerial act are to be found in our Constitution and in our case law, both before and after Mississippi v. Johnson. Article III, Section 2 of the Constitution provides that the federal judicial power shall extend to certain cases and controversies. No mention is made in Article III, or in any other constitutional provision, that certain disputes, otherwise subject to the judicial

---

43. In 1838 in Kendall v. United States, *supra* at 610 of 12 Pet., the Court wrote:

> We shall not, therefore, enter into any particular examination of the line to be drawn between the powers of the executive and judicial departments of the government. The theory of the Constitution undoubtedly is that the great powers of the government are divided into separate departments; and so far as these powers are derived from the Constitution, the departments may be regarded as independent of each other. But beyond that, all are subject to regulations by law, touching the discharge of the duties required to be performed.
> *The executive power is vested in a President, and as far as his powers are derived from the Constitution, he is beyond the reach of any other department, except in the mode prescribed by the Constitution through the impeaching power.* But it by no means follows that every officer in every branch of that department is under the exclusive direction of the President. Such a principle, we apprehend, is not, and certainly cannot be claimed by the President.

> There are certain political duties imposed upon many officers in the executive department, the discharge of which is under the direction of the President. But it would be an alarming doctrine that Congress cannot impose upon *any executive officer* any duty they may think proper, which is not repugnant to any rights secured and protected by the Constitution; and in such cases, the duty and responsiblity grow out of and are subject to the control of the law, and not to the direction of the President. And this is emphatically the case where the duty enjoined is of a mere ministerial character. [Emphases supplied.]

The question of whether the President if he fails to execute a ministerial duty under a statute constitutionally enacted by the Congress can thus be said to be acting not in accordance with his constitutional powers and can be subject to mandamus by a federal court is seemingly left unanswered. At least, the Mississippi v. Johnson Court apparently so assumed since it cited and discussed *Kendall* (at 499) after specifically stating it was not reaching the question.

power, lose that status if the President is a party defendant. Thus, any claim of immunity which the President asserts in this suit must be found in the case law. And while immunities have been created by the case law for judges in certain contexts, *see* Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and for executive officials with regard to their exercise of discretionary duties, *see* Barr v. Mateo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), no immunity established under any case known to this Court bars every suit against the President for injunctive, declaratory or mandamus relief. A good faith defense in a suit for damages brought against any federal official as an individual is seemingly established by Bivens v. Six Unknown Agents, 456 F.2d 1339 (2d Cir. 1972), on remand from the Supreme Court, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), but that defense is not assertable in the face of a quest limited to injunctive, declaratory or mandamus relief.

In Marbury v. Madison, *supra,* Mr. Chief Justice Marshall commented (5 U.S. (1 Cranch) at 162–63)[44] upon the importance of providing an individual with a remedy when he is injured by a violation of law and noted the availability of the King himself in Great Britain as a defendant in such a situation. If the King of Great Britain is subject to suit, although under the polite guise of "petition," it would be anomalous to conclude that the President of the United States, likewise the Head of State, but certainly not entitled to claim the status of a King under the Constitution *(see The Federalist,* Number 69), is immune from any lawsuit whatsoever. The Chief Justice further observed in *Marbury* (at 163):

The government of the United States has been emphatically termed a

government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right.

If this obloquy is to be cast on the jurisprudence of our country, it must arise from the peculiar character of the case.

The Chief Justice then outlined the types of cases in which the President or his officers would be immune from suit and contrasted them to cases in which that immunity would fall.[45] The Chief Justice concluded that officers of the executive branch are immune from suit in the performance of acts over which they possess a legal discretion but lose that immunity when their challenged acts are ministerial.[46] Moreover, the determination of whether mandamus should issue to compel the performance of an official act, Mr. Chief Justice Marshall stated, depends not on the status of the executive officer sued but upon whether the challenged act sought to be compelled is ministerial rather than discretionary.[47] Mr. Chief Justice Marshall clearly did not specifically state that the President could be reached by mandamus. However, that conclusion is certainly not incompatible with his statement that the propriety of issuing mandamus is not dependent on the office of the person to whom the writ is directed. And despite the reservation in Mississippi v. Johnson with regard to the question of whether the President could ever be mandamused, the Court, speaking about two years later in The Floyd Acceptance, 74 U.S. (7 Wall.) 666, 676–677, 19 L.Ed. 169 (1868), did not hesitate to state:

We have no officers in this government from the President down to the most subordinate agent, who does not hold office under the law, with prescribed duties and limited authority.

44. *See* the quotations at p. 590 *supra* in the body of this opinion.

45. *See* Marbury v. Madison, *supra* at 165–166; *see* the quotation set forth *supra* at pp. 590–592 in the body of this opinion.

46. *Id.* at 165–166; at pp. 590–592 of this opinion.

47. *Id.* at 170–171; at pp. 590–592 of this opinion.

And while some of these, as the President, the Legislature and the Judiciary, exercise powers in some sense left to the more general definitions necessarily incident to fundamental law found in the Constitution, the larger portion of them are the creation of statutory law, with duties and powers prescribed and limited by that law.

In Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, .72 S.Ct. 863, 96 L.Ed. 1153 (1952), President Truman asserted the authority to issue an executive order directing the Secretary of Commerce to take possession of and operate most of the nation's steel mills. Although the challenge to the legality of the President's order was made via a suit against the Secretary of Commerce, the Supreme Court apparently viewed the suit as one challenging the President's act. The opening words from Mr. Justice Black's majority opinion read (at 582, 72 S.Ct. at 864):

> We are asked to decide whether the President was acting within his constitutional power when he issued an order directing the Secretary of Commerce to take possession of and operate most of the Nation's steel mills.
> * * *

The Court held that the President's authority to order seizure of the steel mills was unconstitutional and affirmed the District Court's decision enjoining the Secretary of Commerce from carrying out that order. In his concluding statement, Mr. Justice Black stressed that the President has no authority to "legislate" under any circumstances, even if Congress acted unwisely (at 589, 72 S. Ct. at 867):

> The Founders of this Nation entrusted the law-making power to the Congress alone in both good and bad times. It would do no good to recall the historical events, the fears of power and the hopes for freedom that lay behind their choice. Such a review would but confirm our holding that this seizure order cannot stand.[48]

In his concurring opinion in *Youngstown*, Mr. Justice Frankfurter eloquently expressed the necessity for a judicial check upon the unconstitutional assertion of power by the President, even if that check may in the short run adversely affect the public interest, in order to avoid even an initial step toward tyranny:

> * * * The experience through which the world has passed in our own day has made vivid the realization that the Framers of our Constitution were not inexperienced doctrinaires. These long-headed statesmen had no illusion that our people enjoyed biological or psychological or sociological immunities from the hazards of concentrated power. It is absurd to see a dictator in a representative product of the sturdy democratic traditions of the Mississippi Valley. The accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority. [at 593–594, 72 S.Ct. at 889]
>
> * * * * * *
>
> * * * To deny inquiry into the President's power in a case like this, because of the damage to the public interest to be feared from upsetting its exercise by him, would in effect always preclude inquiry into challenged power, which presumably only avowed

48. If the President's erroneous interpretation of the FPCA and Section 3 of the ESA Amendments were held beyond judicial scrutiny, then the President would seemingly be enabled to exercise legislative authority by acting contrary to congressional mandate. As Mr. Justice Holmes stated in a dissenting opinion in Myers v. United States, 272 U.S. 52, 177, 47 S.Ct. 21, 71 L.Ed. 160 (1926):

> * * * The duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power.

(cited with approval by Mr. Justice Frankfurter in *Youngstown Sheet & Tube Co.*, *supra* at 610, of 343 U.S., 72 S.Ct. 863, 897).

great public interest brings into action. And so, with the utmost unwillingness, with every desire to avoid judicial inquiry into the powers and duties of the other two branches of the government, I cannot escape consideration of the legality of Executive Order No. 10340. [at 596, 72 S.Ct. at 890]

\* \* \* \* \* \*

A scheme of government like ours no doubt at times feels the lack of power to act with complete, all-embracing, swiftly moving authority. No doubt a government with distributed authority, subject to be challenged in the courts of law, at least long enough to consider and adjudicate the challenge, labors under restrictions from which other governments are free. It has not been our tradition to envy such governments. In any event our government was designed to have such restrictions. The price was deemed not too high in view of the safeguards which these restrictions afford. \* \* \* [at 613, 72 S.Ct. at 898][49]

In Nixon v. Sirica, *supra,* 487 F.2d p. 709, the majority per curiam opinion, after citing, *inter alia,* Kendall v. United States ex rel. Stokes, *supra,* and noting that in Nixon v. Sirica, as opposed to those cited cases, the President was himself a party, commented that those "cases can be [thus] formally distinguished. As Judge Sirica noted, however, to rule that this case turns on such a distinction would be to exalt the form of *Youngstown Sheet & Tube* over its substance. Justice Black, writing for the *Youngstown* majority, made it clear that the Court understood its affirmance effectively to restrain the president. There is not the slightest hint in any of the *Youngstown* opinions that the case would have been viewed differently if President Truman rather than Secretary Sawyer had been the named party.

\* \* \*" (Footnote omitted.) And dissenting in Nixon v. Sirica, which was concerned with the issue of whether the President had an absolute privilege to withhold in the face of a subpoena certain documents and tapes in his possession, Judge Wilkey wrote (at p. 793 of 487 F.2d):

> *Youngstown* involved no documents, no tapes, no Presidential conversations —no assertion of a Constitutional privilege of any kind. *Youngstown* represents the Judicial power, by compulsory process or otherwise, to prohibit the Executive from engaging in actions contrary to law. *Youngstown* represents the principle that no man, cabinet minister or Chief Executive himself, is above the law; *Youngstown* says nothing about *Which Branch Decides* a Constitutional privilege based on separation of powers. [Footnotes omitted; emphasis in original.]

In this case, the question which divided this Court in Nixon v. Sirica is not present. There is not posed herein any question of constitutional or other privilege.

The Government also contends that if the President is not held immune from this and similar lawsuits, there will be intolerable interference with the effective functioning of Government. To begin with, there is serious question whether presidential actions inconsistent with congressional mandates constitute effective Government. Moreover, as Mr. Justice Brandeis observed in his dissenting opinion in Myers v. United States, 272 U.S. 52, 293, 47 S.Ct. 21, 85, 71 L. Ed. 160 (1927),[50] the doctrine of separation of powers was established in the Constitution not to promote governmental efficiency but to prevent arbitrary power.

\* \* \* The doctrine of the separation of powers was adopted by the

---

49. *See also* Ex parte Milligan, 71 U.S. (4 Wall.) 2, 118–121, 18 L.Ed. 281 (1866).

50. Justice Brandeis' dissent in *Myers* was cited with approval by Justices Frankfurter and Douglas in concurring opinions in *Youngstown Sheet & Tube Co., supra* at 613–614, 629 of 343 U.S., 72 S.Ct. 863 respectively.

Convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy. * * *

■ Under our system of law, the judiciary has a duty envisioned by the constitutional principle of checks and balances to keep both the Executive and Congress within their respective constitutional domains [51] in order to prevent that concentration of power which the Founding Fathers so feared. *See The Federalist,* Number 51. This suit presents neither a political question nor a challenge to Executive discretion. Thus, in the circumstances of this case, this Court should be extremely reluctant in light of the fundamental constitutional reasons for subjecting Executive actions to the purview of judicial scrutiny to hold that the federal judiciary lacks power to compel the President to perform a ministerial duty in accordance with the law.

In United States v. Burr, 25 F.Cas. 30, 34 (No. 14,692–D) (C.C.Va.1807), Mr. Chief Justice Marshall, sitting on Circuit, rejected the view that the President enjoyed a judicial immunity comparable to that of the King of England, and wrote (at 34):

* * * Of the many points of difference which exist between the first magistrate in England and the first magistrate of the United States, in respect to the personal dignity conferred on them by the constitutions of their respective nations, the court will only select and mention two. It is a principle of the English constitution that the king can do no wrong, that no blame can be imputed to him, that he cannot be named in debate. By the constitution of the United States, the president, as well as any other officer of the government, may be impeached, and may be removed from office on high crimes and misdemanors. By the constitution of Great Britain, the crown is hereditary, and the monarch can never be a subject. By that of the United States, the president is elected from the mass of the people, and, on the expiration of the time for which he is elected, returns to the mass of the people again. How essentially this difference of circumstances must vary the policy of the laws of the two countries, in reference to the personal dignity of the executive chief, will be perceived by every person. In this respect the first magistrate of the Union may more properly be likened to the first magistrate of a state; at any rate, under the former Confederation; and it is not known ever to have been doubted, but that the chief magistrate of a state might be served with a subpoena ad testificandum.[52]

While the history of the *Burr* litigation has created a difference of opinion among the members of this Court in Nixon v. Sirica, *supra,* as to the scope of the judicial subpoena power as directed against the President, there is no room for any difference as to the President's amenability to legal process, no matter how much a Court in a given case may seek to avoid subjecting the President or any executive officer to judicial orders resulting from the exercise of legal process.

---

51. The Supreme Court is subject to constitutional checks by virtue of the congressional power to impeach and to regulate its appellate jurisdiction and by virtue of the power to amend the Constitution. That latter process, resulting in the Twenty-Sixth Amendment to the Constitution, effectively overruled the Supreme Court's decision in Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct.

260, 27 L.Ed.2d 272 (1970), holding unconstitutional a federal statute, as applied to state elections, lowering the minimum age of voters to 18 years.

52. *See also* Minnesota Chippewa Tribe v. Carlucci, 358 F.Supp. 973 (D.D.C., 1973) (President subject to suit for failure to appoint members of the National Advisory Council on Indian Education).

As Mr. Justice Van Devanter, who had been Secretary of the Interior,[53] wrote in Lane v. Hoglund, 244 U.S. 174, 181, 37 S.Ct. 558, 560, 61 L.Ed. 1066 (1917), a case in which the defendant was the then Secretary of that department:

> True, this court always is reluctant to award or sustain a writ of mandamus against an executive officer, and yet cases sometimes arise when it is constrained by settled principles of law and the exigency of the particular situation to do so. [Citations omitted.]

And that judicial duty exists whether the President or a subordinate executive officer is the defendant. "The discretionary-ministerial distinction concerns the nature of the act or omission under review not the official title of the defendant. No case holds that an act is discretionary merely because the President is the actor." Nixon v. Sirica, *supra* (p. 712 of 487 F.2d) (footnote omitted).

In most instances, the President speaks and acts through lower governmental officials so that suits challenging the legality of the President's acts may be brought without regard to any possible special presidential immunity by *suing a subordinate executive official. See, e. g.,* Youngstown Sheet & Tube Co. v. Sawyer, *supra* (Secretary of Commerce sued). As noted *supra* (at p. 611), it would be exalting form over substance if the President's acts were held to be beyond the reach of judicial scrutiny when he himself is the defendant, but held within judicial control when he and/or the Congress has delegated the performance of duties to federal officials subordinate to the President and one or more of them can be named as a defendant.[54] That conclusion seems especially appropriate in this case where the President could have law-

fully designated an agent to perform his duty to adjust pay under the FPCA.[55] Moreover, for this Court to hold that the President is immune from this suit challenging his failure to perform a ministerial act would have the almost inevitable result of causing the Congress in the future not to vest in the President, or at the President's option, in his delegate, power of execution, but rather to confer that power directly upon cabinet officers or other federal officials designated by the Congress itself. The President can in many instances seemingly best determine how both ministerial and discretionary responsibilities in connection with the execution of federal statutes should be allocated among the various cabinet departments or other governmental units. Congress may thus often desire to give the President the authority to execute either himself, or to delegate. But the Congress might well not confer that authority upon the President if the Congress knew no person could maintain a suit against the President to require the President to comply with a congressional mandate. Against such a background, a court should be reluctant to interpret the Constitution in a manner which could generate unwarranted friction between the Congress and the President, particularly if that friction is not clearly constitutionally required.

### Additional Analysis of Mississippi v. Johnson

Because both the District Court and the Government have relied so heavily on the proposition that the President is not properly suable in this case, further analysis of Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 18 L.Ed. 437 (1866) is appropriate. As previously discussed, the Supreme Court, in the course of holding that the President's duties under the challenged Reconstruction Acts were not ministerial, specifically left

---

53. Seaton v. Texas Co., 103 U.S.App.D.C. 163, 256 F.2d 718, 723 n. 9 (1958).

54. *Cf.* Doe v. McMillan, 412 U.S. 306, 324, 93 S.Ct 2018, 36 L.Ed.2d 306 (1973) ; Gravel v.

United States, 408 U.S. 606, 613–618, 92 S. Ct. 2614, 33 L.Ed.2d 583 (1972).

55. *See* n. 7 *supra.*

open the question of whether a court could compel the President to perform a ministerial act.[56] Moreover, the Court also indicated that the suit was improper because it presented a nonjusticiable political question.[57] Noting that the challenged Reconstruction Acts conferred military duties upon the President, the Court characterized those duties as "purely executive and political". Additionally, the Court noted (at 499) that judicial enforcement of the President's duties under the challenged Acts would be "an absurd and excessive extravagance", quoting (at 499) from Marbury v. Madison, *supra* at 170 of 5 U.S. (1 Cranch.), and Mr. Chief Justice Marshall's discussion of "political" questions.

Support for the conclusion that Mississippi v. Johnson was dismissed on the ground that it presented a political question is also to be found in light of the Court's subsequent decisions in Georgia v. Stanton, 73 U.S. (6 Wall.) 50, 18 L.Ed. 721 (1867), and Mississippi v. Stanton, 154 U.S. 554, 14 S.Ct. 1209, 18 L.Ed. 725 (1893) (but decided March 30, 1868). In those cases, the states of Georgia and Mississippi challenged the constitutionality of the same two Reconstruction Acts as were challenged in Mississippi v. Johnson. The Court dismissed both suits on the ground that they presented a nonjusticiable political question.[58] Because this suit presents neither a nonjusticiable political question nor a constitutional challenge to a statute giving the President discretionary duties, Mississippi v. Johnson does not require dismissal of this suit.

Further, Mississippi v. Johnson is distinguishable from this case in another significant respect. In that case the dismissal of the suit against the President did not bar the plaintiff from challenging the Reconstruction Acts in court. In fact, shortly after Mississippi v. Johnson was dismissed, the State of Mississippi brought suit against Secretary of War Stanton and two other defendants challenging the constitutionality of those same two Reconstruction Acts in the Supreme Court in Mississippi v. Stanton, *supra*. It is true that the State of Mississippi did not then get a ruling from the Supreme Court on the constitutionality of the challenged Reconstruction Acts because the suit was dismissed for presenting a nonjusticiable political question. But Mississippi v. Stanton indicates that even assuming Mississippi v. Johnson was dismissed solely because the President was a defendant, that result probably did not leave the State of Mississippi without any proper defendant to sue to test the constitutionality of the Reconstruction Acts.[59] In sharp contrast to Mississippi v. Johnson are the circumstances of this suit wherein failure to permit the President to be sued on the ground of separation of powers would prevent the appellant from

56. Mississippi v. Johnson, *supra* at 497. *See also* Baker v. Carr, *supra* at 225 n. 52, of 369 U.S., 82 S.Ct. 691; Atlee v. Laird, 347 F.Supp. 689, 694–695 (E.D.Pa. 1972), aff'd, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973).

57. In Atlee v. Laird, 347 F.Supp. 689 (E.D. Pa., 1972), aff'd, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973), the Court seems to have read Mississippi v. Johnson as being dismissed on the ground that it presented a political question. Mississippi v. Johnson does contain language (at 500–501 of 71 U. S. (4 Wall.) indicating that the suit was dismissed because an injunction against the President could not be enforced by the Court and because if the President complied with the injunction he might be impeached and the Court might be forced to consider enjoining the Senate from sitting as a court of impeachment. However, that language is used in the factual context of a case in which highly "political" and "militarily related" Reconstruction Acts were challenged.

58. *See* Baker v. Carr, *supra* at 224–225 of 369 U.S., 82 S.Ct. 691.

59. However, it is not entirely clear that the defendants sued in Georgia v. Stanton, *supra* and Mississippi v. Stanton, *supra* were considered proper defendants because in light of the disposition of those cases the Court found it necessary to decide whether jurisdiction over the defendants existed. Georgia v. Stanton, *supra* at 77 of 73 U.S. (6 Wall.).

enforcing its legal rights in federal court. As Mr. Chief Justice Marshall noted in *Marbury* (at 163 of 5 U.S. (1 Cranch.)), courts are most reluctant to fashion a legal doctrine or make a decision which deprives persons of a means of enforcing their legal rights. That reluctance. has been recently evidenced in Powell v. McCormack, *supra*. In that case, the Court dismissed a suit against certain members of the House of Representatives challenging the constitutionality of a House decision to exclude Mr. Powell from the 90th Congress on the ground that the Speech or Debate Clause, Article I, Section 6, granted the members immunity under the circumstances. However, the action was allowed to be maintained against certain House employees who acted pursuant to express orders of the House. In so doing, the Court (at 395 U.S. *supra* at 506 n. 26, 89 S.Ct. at 1956) expressed a reluctance to fashion an immunity doctrine barring an injured party from any judicial relief whatsoever:

> Given our disposition of this issue, we need not decide whether under the Speech or Debate Clause petitioners would be entitled to maintain this action solely against members of Congress where no agents participated in the challenged action and no other remedy was available. [Citations omitted.][60]

In this case, the President has not delegated to any subordinate executive official his powers under the applicable federal pay statute.[61] Thus, no federal official other than the President can be properly named as defendant herein in the place of the President. Nor may this suit be instituted as a money damage suit in the Court of Claims by one or more or all of the members of NTEU, claiming increased pay for the period October, 1972–January, 1973, and naming the United States as the defendant, because "[b]efore any such person is entitled to such a judgment" against the United States, he must establish in some court that the President's failure to put his pay raise into effect in October, 1972 "was legally wrong and that he is entitled to a declaration of" his entitlement to that raise as of October, 1972. United States v. King, 395 U.S. 1, 3, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969), rev'g on other grounds, King v. United States, 390 F.2d 894, 182 Ct.Cl. 631 (1968).[62] · Accordingly, if plaintiff members are to be accorded a remedy, the sole defendant they can appropriately name in asserting their claims is the President of the United States.

The Government suggests that the way in which the President's failure to enforce the FPCA may be challenged is by impeachment of the President by the Congress. However, even if such failure to enforce constitutes an impeachable offense under the Constitution, it hardly opens up a meaningful road to effectuate the rights of NTEU's members under the FPCA, certainly not on any reasonably timely schedule. Furthermore, the Constitution should not be construed so as to paint this nation into a corner which leaves available only the use of the impeachment process to enforce the performance of a perfunctory duty by the President. Making available only the impeachment process in a case such as this resembles making available a nuclear bomb as the sole weapon to bring down a pheasant. In this case, simple justice requires a sensible speedy remedy, and "[j]ustice", as was written nearly two hundred years ago in *The Federalist*, Number 51, "is

60. *See* Atlee v. Nixon, 336 F.Supp. 790, 792 (E.D.Pa., 1972).

61. *See* n. 7 *supra*.

62. In *King*, Mr. Justice Black held, reversing the Court below, that the Court of Claims is not empowered to issue a declaratory judgment, even with regard to a claim having "a money cast", King v. United States, 390 F. 2d *supra* at 909. In so doing, Mr. Justice Black seemingly approved Judge Davis' discussion at 390 F.2d *supra* at 908–909, with regard to the need for a declaration of right before a money claim based on that right could be asserted. 395 U.S. *supra* at 3, 89 S.Ct. 624.

the end of government. It is the end of civil society. It ever has been and ever will be preserved until it be obtained, or until liberty be lost in the pursuit". Such truths are immutable—they live—they govern us—and they compel our course of action in a case such as this.

### III

 This Court concludes that in this case the constitutional principles enunciated by Mr. Chief Justice Marshall in Marbury v. Madison as to the Secretary of State are equally applicable to the President and holds that jurisdiction in this case exists pursuant to 28 U.S.C. § 1361 [63] to support the issuance of a writ of mandamus directing the President to effectuate the pay raise sought by plaintiff as of October, 1972. But because this Court possesses that jurisdiction and accordingly possesses the authority to mandamus the President to perform the ministerial duty involved herein does not mean that this Court must or should exercise that authority at this time. On the contrary, this Court may, if it believes it more appropriate, refrain at this time from issuing a writ of mandamus to the President and opt instead to act pursuant to the provisions of the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 (1970).[64] That Act does not itself provide an independent subject matter jurisdictional base. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). But because in this case subject matter jurisdiction is present under section 1361, this Court may utilize the tool of declaratory relief. *Cf.* Powell v. McCormack, *supra* at 499 of 395 U.S., 89 S.Ct. 1944; State Highway Comm'n v. Volpe, 479 F. 2d 1099 (8th Cir., 1973), Cumulative Report, Joint Comm. on Cong.Op. 93rd Cong., 1st Sess., 345 at 350 (1973), Peoples v. United States Dept. of Agriculture, 138 U.S.App.D.C. 291, 427 F. 2d 561, 564–565 (1970).[65] This case presents a most appropriate instance for the use of a declaratory decree. Accordingly, we confine ourselves at this time to a declaration of the law, that is, that the President has a constitutional duty forthwith to grant, effective as of October, 1972, the federal pay increase mandated by the Congress and sought by NTEU herein so that the members of NTEU can collect what has been due them for many months. We so restrict ourselves at this time in order to show the utmost respect to the office of the Presidency and to avoid, if at all possible, direct involvement by the Courts in the President's constitutional duty faithfully to execute the laws and any clash between the judicial and executive branches of the Government. *See* Mr. Justice Frankfurter's strongly indicated suggestion in his concurrence in Youngstown Sheet & Tube Co. v. Sawyer, *supra* at 595 of 343 U.S., 72 S.Ct. 863. *And see* the approach of all participating members of this Court in Nixon v. Sirica, *supra*. We therefore remand this case to the District Court for further proceedings, in accordance with this opinion, after a reasonable time elapses in order that the President be given every opportunity to implement the law as it is declared herein or timely to seek review of this decision.

---

63. *See* n. 4 *supra.*

64. That section provides:
 In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

65. The issuance of declaratory relief after mandamus jurisdiction has been established would not appear to be contrary to McQueary v. Laird, 449 F.2d 608, 611 (10th Cir., 1971) (despite the initial impact of one or two sentences in *McQueary* at 611); or to Prairie Band of Pottawatomie Tribe of Indiana v. Udall, 355 F.2d 364, 367 (10th Cir.), cert. denied, 385 U.S. 831, 87 S.Ct. 70, 17 L.Ed.2d 67 (1966).