Dr. Louis LEVY, Individually and representative of a class, Plaintiff,

v.

Dr. Karl F. URBACH, Director of United States Public Health Service Hospital at San Francisco, California, Individually and in his official capacity, and William N. Conrardy, Director of the United States General Accounting Office for the San Francisco Region, and the United States of America, a body politic, Defendants.

Steven DAVIS, Paul Diehl, Robert Elliston, Phillip Glengary, Wayne Hardwick, Michael Howard, Boyce Kiger, Oren Leong, Randall H. Ogorskin, James Pendleton, Jr., Lawrence Quan, Michael Rokeach, Steven Rokeach, Robert Thompson, Charles Webb, J. Michael Wise, Plaintiffs,

v.

John C. DROKE, Director, Office of Administrative Management, United States Public Health Service, Dr. Paul S. Ehrlich, Acting Surgeon General of the United States, Individually and in their official capacity, and the United States of America, a body politic, Defendants.

Nos. C-76-1819 WHO, C-76-2209 WHO.

United States District Court,
N. D. California.

Feb. 28, 1978.

John L. Cooper, Farella, Braun & Martel, San Francisco, Cal., for plaintiff Levy.

Mark I. Schickman, San Francisco, Cal., for plaintiffs Davis et al.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., G. William Hunter, U. S. Atty., Robert E. Carey, Jr., Asst. U. S. Atty., San Francisco, Cal., Barbara B. O'Malley, Sandra M. Schraibman, Civ. Div., Dept. of Justice, Washington, D. C., for defendants.

## OPINION

ORRICK, District Judge.

Plaintiffs in these two related actions seek incentive pay allegedly past due and owing them under certain provisions of the Career Compensation Act of 1949 [1] ("the 1949 Act") and the Public Health Service Act of 1944 [2] ("the 1944 Act") for duty involving intimate contact with persons afflicted with Hansen's disease, better known as leprosy. The *Davis* action was brought under the 1949 Act by sixteen plaintiffs, each of whom was or is a commissioned officer of the United States Public Health Service ("USPHS") assigned to duty at the USPHS Hospital in San Francisco, California. The *Levy* action was also brought under the 1949 Act by Dr. Louis Levy, individually and as representative of a class consisting of members of the USPHS as-signed to duty involving intimate contact with persons afflicted with leprosy. The *Levy* complaint was subsequently amended to add class allegations on behalf of civil service officers and employees allegedly entitled to receive incentive pay under the 1944 Act.

Central to both cases is the question whether the incentive pay provided to be paid under certain conditions under both the 1949 Act and the 1944 Act should be paid to personnel at the USPHS Hospital in San Francisco who have had contact with Hansen's disease patients.

The parties in the *Davis* action filed cross-motions for summary judgment, and the *Levy* plaintiffs moved for certification of a class defined as all members of the USPHS and all civil service employees who have performed duties for thirty days or more at the USPHS Hospital in San Francisco at any time during the six years preceding the filing of the *Levy* complaint. In the interest of judicial economy, these motions were continued pending an evidentiary hearing to determine whether the USPHS Hospital in San Francisco is an institution at which incentive pay for leprosy duty is available under either or both acts. For the reasons which follow, the Court holds that plaintiffs in neither case are entitled to extra pay under either statute.

### I.

#### A.

The 1949 Act was a comprehensive revision of the pay systems for the uniformed services [3] designed to "attract and retain first-class personnel." [4] As presently codified at 37 U.S.C. § 301, it provides in relevant part:

"(a) Subject to regulations prescribed by the President, a member of a uni-

---

1. 37 U.S.C. § 301(a)(7) (1968) (original version at ch. 681, § 204(a)(6), 63 Stat. 809 (1949)).

2. 42 U.S.C. § 210(e) (1974) (original version at ch. 373, § 209(g), 58 Stat. 687 (1944)).

3. The "uniformed services" include the United States Public Health Service. 37 U.S.C. § 101(3).

4. S.Rep.No.733, 81st Cong., 1st Sess. 1, *reprinted in* [1949] U.S.Code Cong.Serv., p. 2089.

formed service who is entitled to basic pay is also entitled to incentive pay, in the amount set forth in subsection (b) or (c) of this section, for the performance of hazardous duty required by orders. For the purposes of this subsection, 'hazardous duty' means duty—

\*    \*    \*    \*    \*    \*

(7) involving intimate contact with persons afflicted with leprosy."

Pursuant to the 1949 Act, Executive Order 11157[5] was promulgated, regulating entitlement to incentive pay for leprosy duty as follows:

"Sec. 109. As used in section 301(a) of Title 37 of the United States Code—

(a) The term 'duty involving intimate contact with persons afflicted with leprosy' shall be construed to mean duty performed by any member who is assigned by competent orders to a leprosarium for the performance of duty for a period of 30 days or more or for a period of instruction, whether or not such leprosarium is under the jurisdiction of one of the uniformed services."

Two arguments are presented in support of plaintiffs' claim under the 1949 Act. First, it is argued that members of the USPHS indisputably perform duty at the USPHS Hospital in San Francisco involving intimate contact with Hansen's disease patients, and that Executive Order 11157 is a nullity to the extent it imposes the further requirement that such duty be performed at a leprosarium. Alternatively, plaintiffs maintain that the USPHS Hospital in San Francisco is a leprosarium within the meaning of Executive Order 11157.

■ Plaintiffs' first argument is based on the principle that the President is powerless to alter or selectively execute a statute as written by Congress. Section 301, however, as written by Congress, expressly makes entitlement to incentive pay "[s]ubject to regulations prescribed by the President."[6] Such delegation of authority to construe and administer statutes is a familiar and necessary aspect of much legislation. *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 372–73, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973).

Plaintiffs assume a heavy burden in attempting to nullify Executive Order 11157. The standard adopted by the Ninth Circuit in *Ramirez v. Immigration & Naturalization Service*, 550 F.2d 560, 564 (9th Cir. 1977), is that stated in *Boske v. Comingore*, 177 U.S. 459, 470, 20 S.Ct. 701, 706, 44 L.Ed. 846 (1900):

"[A] regulation \* \* \* should not be disregarded or annulled unless, in the judgment of the court, it is plainly and palpably inconsistent with law. Those who insist that such a regulation is invalid must make its invalidity so manifest that the court has no choice except to hold that the Secretary has exceeded his authority and employed means that are

---

**5.** Exec. Order No. 11157, 3 C.F.R. 200, 204 (1964–1965), *reprinted in* 37 U.S.C. § 301 app., at 376 (1968).

**6.** Plaintiffs attempt to avoid the impact of this statutory proviso by reference to *National Treasury Employees Union v. Nixon*, 160 U.S. App.D.C. 321, 492 F.2d 587 (1974), a case characterized by plaintiffs as "squarely on point." In *National Treasury Employees*, a public employee union sought to compel then President Nixon to implement a pay adjustment for federal employees allegedly required by Section 5305(a) of the Federal Pay Comparability Act ("FPCA"), 5 U.S.C. § 5301 *et seq.* (1970). Plaintiffs point out that 5 U.S.C. § 5304 uses the phrase "subject to such policies and regulations as the President may prescribe," but that despite this language the court held that President Nixon was obligated to perform the acts

required by statute. In the first place, taken in context, Section 5304 is not analogous to 37 U.S.C. § 301 since it does not purport to modify any entitlement under the statute. Second, in *National Treasury Employees*, the President did not rely on Section 5304 of the FPCA, but rather on a completely different act of Congress, namely, Section 3 of the Amendments to the Economic Stabilization Act, 85 Stat. 753 (1971). *National Treasury Employees Union v. Nixon, supra*, 160 U.S.App.D.C. at 330, 492 F.2d at 596. Indeed, Section 5304 does not even appear in the court's opinion. Moreover, the court specifically held that the ministerial duty imposed by the FPCA was clearly prescribed and that the statute did not authorize a final construction of the statute by the President. *Id.* 160 U.S.App.D.C. at 337, 492 F.2d at 603.

not at all appropriate to the end specified in the act of Congress."

No such palpable inconsistency is present here. The statute expressly authorizes the President to promulgate regulations limiting the entitlement to incentive pay. The President's authority being clear, the issue presented is whether Executive Order 11157 employs means that are not at all appropriate to the end specified by Congress.

Plaintiffs contend that the purpose of the statute is to compensate members of the uniformed services for hazardous duty, and that Congress has determined that duty involving intimate contact with persons afflicted with Hansen's disease is hazardous. Therefore, according to plaintiffs, since Executive Order 11157 precludes compensating members whose hazardous duty is not performed at a leprosarium, it is inconsistent with the purpose of the statute.

However, even if Congress' only concern in enacting Section 301(a)(7) were compensation for the hazards of intimate contact with Hansen's disease patients, the Court would be reluctant to conclude that the "leprosarium requirement" imposed by Executive Order 11157 is not at all appropriate to the statute's purpose. As is discussed *infra*, a leprosarium is a specialty hospital devoted primarily to the care of Hansen's disease patients. Implementing the statute by restricting incentive pay to duty at institutions where intimate contact with Hansen's disease patients is reasonably certain, deliberate, and continuous is not inappropriate to the legislative objective.

█ Moreover, the legislative history of the 1949 Act, though by no means voluminous, documents a broader rationale for Section 301(a)(7) than concern for the potential health hazards of working with Hansen's disease patients.[7] The 1949 Act was based on the findings of the Advisory Commission on Service Pay, better known as the Hook Commission. *See Hearings on H.R. 2533 Before a Subcomm. of the House Comm. on Armed Services*, 81st Cong., 1st Sess. 1579–1597 (1949) (hereinafter cited as *1949 Hearings*). Commenting on the justification for extra pay, the Hook Commission stated:

"Close examination of the nature of hazardous duty and the expressed or implied reasons for accepting risks indicated that the *incentive to engage and remain in hazardous occupations* provided a more realistic and practical basis for determining the rates of special pay than the theory of recompense for shorter career expectancy. The recompense or replacement concept, although promoted for many years as the sole argument for hazard pay, was found wanting for several reasons.

First, the higher mortality rate during peacetime is a major factor in flying only and, even in this field, varies considerably with technical experiment and changes, size of force, conditions of craft, and time and place. Submarine duty in peacetime, it was found, involved virtually no fatalities since the introduction of a hazard differential but, in wartime, men in this service had a high fatality rate. Parachutists, on the other hand, had the highest injury rate. Diving and leprosy duties offered potential death and disease to a great degree, but admittedly are primarily not dangerous but, rather, disagreeable and generally unsought occupations. * * *

\*      \*      \*      \*      \*      \*

Second, from interviews with both administrative personnel and those engaged in hazardous work, the additional pay is now regarded frankly as a supply-and-demand differential, to induce capable men to undertake the known or assumed risks

---

7. Plaintiffs object to any recourse to legislative history on the ground that the statute is unambiguous, citing *Gilbert v. Commissioner of Internal Revenue*, 241 F.2d 491, 494 (9th Cir. 1957), and *Easson v. Commissioner of Internal Revenue*, 294 F.2d 653, 656 (9th Cir. 1961). Neither case involved the validity of an Executive Order promulgated pursuant to a statute. Here the statute expressly makes entitlement to incentive pay subject to regulations prescribed by the President. To characterize such a conditional entitlement as unambiguous is to ignore the plain language of the statute.

of flying, undersea operations, or other hazards. Further, it serves as an incentive to remain in the chosen field when family responsibility becomes a deterring factor." *Id.* at 1581.

Thus, the Congress was well aware that the philosophy underlying the Commission's recommendations was one of inducement rather than compensation. The decision to offer additional pay even for *"assumed risks"* perfectly illustrates the difference between an incentive system and a compensatory system. The legislation's overall objective was to attract and retain first-class personnel, not to make members whole as recompense for projected injury.

Other portions of the hearings document congressional awareness of the nonhazardous but disagreeable aspects of intimate contact with Hansen's disease patients, including the isolation entailed in working at the nation's only officially designated leprosarium, the National Leprosarium at Carville, Louisiana. *1949 Hearings, supra,* at 1765–1766. Nor did the historical social stigma associated with Hansen's disease escape the attention of Congress. *Id.*

It is apparent that the purpose of Section 301(a)(7) was in large part to induce personnel to perform a disagreeable duty widely believed to be hazardous, rather than solely to recompense members for exposure to actual risks. Given this background, restricting incentive pay to duty performed at leprosaria is certainly an appropriate means to serve the statute's ends. The need for incentives is obviously greater at an institution primarily devoted to the care of Hansen's disease patients than at an urban general hospital where Hansen's disease patients make up a small minority of the hospital population.[8]

■ Finally, it is worth noting that Section 301 has been amended on several occa-sions, but Congress has in no way disturbed the interpretation placed on the statute by Executive Order 11157. The inference is that the Order comports with the intent of Congress. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 274–75, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Zemel v. Rusk,* 381 U.S. 1, 11–12, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *Diamond Ring Ranch, Inc. v. Morton,* 531 F.2d 1397, 1403 (10th Cir. 1976).

### B.

■ Having determined that Executive Order 11157 is valid, the remaining issue to be addressed is whether the USPHS Hospital in San Francisco is a "leprosarium." Much testimony was taken on this rather esoteric inquiry. In addition the Court was cited to various definitions of "leprosarium," of which the following are typical: "A hospital or colony for the treatment and isolation of leprosy patients;"[9] "A hospital especially designed for the care of those suffering from leprosy, especially those who need expert care."[10]

Characterizing the term "leprosarium" as archaic, plaintiff Dr. Louis Levy testified that "definitive care" is offered to Hansen's disease patients at the USPHS Hospital in San Francisco. With respect to the aforementioned definitions of "leprosarium," Dr. Levy testified that Hansen's disease patients hospitalized at the San Francisco Hospital are isolated in the sense that they are not out in the community, though he admitted that they have the run of the hospital and, in fact, are treated in all the Hospital's clinical departments. Dr. Levy stated that the San Francisco Hospital is especially designed for Hansen's disease patients in that the staff has expertise in the area, certain specialized drugs are stocked, and the hospital is equipped with a laboratory utilizing techniques unique to Hansen's

---

8. The Court notes that no evidence was presented indicating that the USPHS Hospital in San Francisco has had difficulty attracting or retaining first-class personnel because incentive pay is not offered. *Compare Hearings on H.R. 2553 Before a Subcomm. of the House Comm. on Armed Services,* 81st Cong., 1st Sess. 1765 (1949), regarding the difficulty in securing volunteers for the National Leprosarium in Carville.

9. *Dorland's Illustrated Medical Dictionary* 849 (25th ed. 1974).

10. *Stedman's Medical Dictionary* 694 (22nd ed. 1972).

disease research. Dr. Levy also pointed out that the hospital radiators are asbestos-covered to protect the characteristically temperature-insensitive extremities of Hansen's disease patients.

In sharp contrast was the testimony of Dr. Karl Urbach, Director of the Hospital, and Dr. Paul Fasal, Chief of the Hansen's Disease Service at the Hospital. Dr. Urbach testified that the Hospital is not a leprosarium, but rather a general hospital of some 300 beds, a small minority of which are occupied by Hansen's disease patients,[11] none of whom are segregated from other patients or confined to a particular ward of the Hospital. According to Dr. Urbach, nothing in the Hospital is especially designed for patients afflicted with Hansen's disease. Dr. Fasal agreed that the San Francisco Hospital is not a leprosarium, as that word is understood in the medical world. Dr. Fasal, a world-famous expert in the treatment of Hansen's disease, testified that "leprosarium" is a viable and current term in his field. In describing the National Leprosarium at Carville, Louisiana, Dr. Fasal gave concrete examples of the kinds of special facilities one might find at a leprosarium. At Carville many of the patients are crippled, so electric carts are provided. To accommodate often mutilated hands, buildings are equipped with electric eye doors; expert hand surgeons are available, as are specialized rehabilitative services for crippled hands. Long-handled coffee cups are provided to protect insensitive hands. Moreover, the leprosarium at Carville is specially designed for long-term care in isolation in that it has extensive educational, recreational, and religious facilities.

Faced with the rather clear differences between a general hospital and a leprosarium, plaintiffs place great reliance on a 1957 Comptroller General decision for the proposition that the term is to be broadly construed as a "hospital for lepers." The relevant passage is as follows:

"The issue actually raised is whether a facility utilized for housing and caring of lepers, if medically recognized as a 'leprosarium' but not officially designated as such, would constitute a 'leprosarium' within the purview of section 9(a), Executive Order No. 10152. [Executive Order No. 10152, 3 C.F.R. 327, 329 (1949–1953), was the predecessor Order to No. 11157, and is identical with respect to the sections here relevant.]

The term 'leprosarium' as used in section 9(a), Executive Order No. 10152, is not required to be construed in so literal and narrow a sense as will result in the introduction of limitations or other restrictions that are not clearly and reasonably required from the language of the law. Whether a particular facility actually being utilized for the housing and care of lepers is or is not a 'leprosarium' is a question of fact and is not dependent entirely upon an official designation of the facility as such. Generally, it is to be anticipated that such a facility will have been officially designated as a 'leprosarium' but, notwithstanding the absence of any such official designation, where the facts clearly establish that the particular facility in question is medically recognized and thus in fact constitutes an asylum or hospital for lepers, duty performed thereat under competent orders would place the member concerned within the purview of section 9(a) of Executive Order No. 10152 and, hence, also within the scope of the incentive pay provisions of the Career Compensation Act of 1949." 36 Comp.Gen. 667, 669.

The quoted passage hurts rather than helps plaintiffs. The discussion clearly indicates that not every facility "actually being utilized for the housing and care of lepers" is a leprosarium. Nevertheless, plaintiffs seize on the phrase "hospital for lepers," and suggest that it somehow modifies the requirement of the Executive Order that such duty be performed at a leprosarium. However, marginal notes on the draft of the Comptroller General's opinion show that "asylum or hospital for lepers" was substi-

---

11. The USPHS Hospital in San Francisco houses approximately 225 patients per day, only 5 to 7 of whom, on the average are leprosy patients.

tuted as a synonym for "leprosarium." The holding of the Comptroller General's opinion is simply that a facility need not be officially designated as a "leprosarium" to fall within the scope of the Executive Order.

Based on the testimony of Drs. Fasal and Urbach, the medical dictionary definitions cited to the Court, and the legislative history of the statute pursuant to which Executive Order 11157 was promulgated, there is no doubt in the Court's mind, and the Court so finds, that the USPHS Hospital in San Francisco is not a leprosarium as that word is used in the Order.[12] It may well be, as Dr. Fasal testified, that the modern trend is away from isolating Hansen's disease patients in leprosaria to treatment in general hospitals. But such a trend cannot convert the USPHS Hospital in San Francisco into a leprosarium.

## II.

### A.

■ Plaintiffs in the *Levy* action also claim extra pay under the 1944 Act on behalf of a class consisting of noncommissioned officers and employees assigned to duty at the USPHS Hospital in San Francisco.[13] In its present form,[14] 42 U.S.C. § 210, the statute reads in pertinent part:

"(e) Whenever any noncommissioned officer or other employee of the Service is assigned for duty which the Surgeon General finds requires intimate contact with persons afflicted with leprosy, he may be entitled to receive, as provided by regulations of the President, in addition to any pay or compensation to which he may otherwise be entitled, not more than one-half of such pay or compensation."

The relevant portion of the regulation on which plaintiffs base their claim provides:

"Every civil service officer or employee of the Service assigned to full-time duty for a period of 30 days or more at a station of the Service devoted to the care of leprosy patients shall receive, while so assigned, in addition to the basic compensation provided by law for his position, a sum equal to 25 per centum of such compensation * * *." 42 C.F.R. § 22.1 (1976).

Plaintiffs do not challenge the regulation. Their claim is simply that the USPHS Hospital in San Francisco is in fact "a station of the Service devoted to the care of leprosy patients."

### B.

■ When the construction of an administrative regulation is in issue, great deference is shown to the agency's interpreta-

---

12. It should be noted that plaintiffs here have also drawn the Court's attention to a consent decree entered into in an action for leprosy pay involving the USPHS Hospital at Staten Island, New York. *Stricks v. Steinfeld*, Civil No. 74–72 (D.D.C., filed June 12, 1972). The settlement, of course, has no binding effect on this Court. In addition, the government points out that at the Staten Island Hospital, Hansen's disease patients are housed exclusively on the dermatology ward of the Hospital and are segregated from other patients in private rooms. The government also suggests that a greater range of rehabilitative services is available at the Staten Island Hospital. Thus, a determination that the dermatology ward at the Staten Island Hospital constitutes a leprosarium is not inconsistent with the Court's holding in the instant case. The Court also notes that the consent judgment in *Stricks* is confined to three full-time physicians who work on the dermatology ward. It includes no support personnel.

13. The defendants' position in *Levy* has been that the 1944 Act is not properly before the Court, because no named plaintiff has specifically alleged civil service status. This fact does not deprive the Court of jurisdiction. The first amended complaint explicitly states that the action is brought on behalf of all civil service officers and employees. Dr. Philip O'Keefe, a named plaintiff, claims civil service status, a fact defendants have been made aware of by way of deposition and answers to interrogatories. Defendants certainly have had ample notice of plaintiffs' claim under the 1944 Act, and plaintiff O'Keefe has standing to assert such a claim.

14. Prior to the enactment of the Career Compensation Act of 1949, the 1944 Act also embraced commissioned officers.

tion. Indeed, its interpretation is entitled to controlling weight unless plainly erroneous or inconsistent with the regulation. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964).

Neither party has clearly articulated a definition of the crucial phrase. Plaintiffs' position appears to be that a hospital which gives definitive care to a significant number of Hansen's disease patients is a "station of the Service devoted to the care of leprosy patients." Defendants maintain that the entitlement to extra pay is essentially the same under both the 1944 Act and the 1949 Act; in other words, that the phrase is the rough equivalent of "leprosarium."

Both interpretations are reasonable, and the deference accorded the administrative construction would ordinarily suffice to decide the matter favorably to the government, since the administrative interpretation does not on its face appear to be either clearly erroneous or inconsistent with the regulation. However, plaintiffs have put forward a serious argument that the regulation should be interpreted to include the USPHS Hospital in San Francisco, and the Court believes the issue warrants further discussion.

The essence of plaintiffs' argument is that while early regulations conditioned extra pay on duty at a station of the Service "exclusively devoted to the care of leprosy patients," [15] the "exclusivity" requirement was subsequently deleted. The inescapable inference, according to plaintiffs, is that the change was made so that general hospitals which treat Hansen's disease patients would be included within the terms of the regulation.

The inference suggested by plaintiffs is certainly reasonable, but it is not the only one which the agency could reasonably draw. Just as reasonable is the inference

that the word "exclusively" was deleted as unnecessarily inflexible. For instance, an isolated leprosarium which also offered general medical services to hospital personnel or dependents might be excluded as not "exclusively" devoted to the care of leprosy patients. Similarly, an otherwise qualified station might be excluded if it conducted research on other communicable diseases or made its specialized rehabilitative services available to nonleprosy patients.

Plaintiffs' interpretation of the critical phrase also appears to be inconsistent with the regulation's mandatory language. The regulation provides that noncommissioned officers and other employees assigned to duty at certain stations *shall* receive extra pay. Under plaintiffs' construction, an officer or employee assigned to a general hospital treating Hansen's disease patients would receive extra pay irrespective of the likelihood of intimate contact with such patients. So interpreted, the regulation would hardly be consonant with the statute, which authorizes extra pay for duty "which the Surgeon General finds *requires* intimate contact with persons afflicted with leprosy." (Emphasis added.) 42 U.S.C. § 210(e). The administrative interpretation, on the other hand, is consistent with the statute, since duty at an institution akin to a leprosarium would almost certainly require intimate contact with leprosy patients.

Moreover, the history of both the regulation and the statute lend support to the agency interpretation. The first interpretive order promulgated pursuant to the 1944 Act was Executive Order 9655, issued by President Truman in 1945. The Order limited extra pay to duty at stations exclusively devoted to the care of leprosy patients.[16] Other portions of the Order make it clear that the President distinguished between duty entitling one to extra pay under the regulation and duty at a general hospital:

---

**15.** Exec. Order No. 9655, §§ 2.91, 3.1, 3 C.F.R. 452, 460, 475 (1943–1948); Exec. Order No. 9993, §§ 21.61, 22.1, 3 C.F.R. 751, 760, 780 (1943–1948).

**16.** Exec. Order No. 9655, §§ 2.91, 3.1, 3 C.F.R. 460, 475 (1943–1948).

"*Sec. 3.2. Exception respecting certain persons.* (a) No civil service officer or employee of the Service who is occupying a position allocated at a level above similar positions at general hospital stations of the Service shall receive any additional payment under section 3.1 until the status of such position has been reallocated in accordance with similar positions at general hospital stations of the Service." [17]

Then in 1952 President Truman issued Executive Order 10354, which deleted the word "exclusively" from the regulation and made several other changes.[18] Significantly, the above-quoted proviso was retained, indicating that the President continued to be concerned that the base pay of someone assigned to duty at a station of the service "devoted to" the care of leprosy patients might be different than the pay of someone occupying a similar position at a general hospital.

The legislative history of the Act itself also supports the agency's restrictive view of what sort of duty Congress had in mind when it passed the 1944 Act. Two statutes providing for extra pay for duty with Hansen's disease patients, both of which applied only to commissioned and noncommissioned officers of the USPHS, were extant at the time the 1944 Act was being considered. In 1905, Congress had passed a law providing for the establishment of a leprosy hospital station at Molokai, Hawaii.[19] Section 7 of that act authorized a 50 percent pay increment for commissioned and noncommis-sioned officers "detailed for duty *at the leprosarium* herein provided for * * * ." [20] (Emphasis added.) Then in 1917 a second law was passed, providing for "the establishment of a home for the care and treatment of persons afflicted with leprosy." [21] Section 5 of that statute also authorized an automatic 50 percent pay increase for USPHS officers "detailed for duty *at the home herein provided for* * * * ." [22] (Emphasis added.)

Thus, when the 1944 Act was passed, repealing the 1905 and 1917 statutes,[23] the entitlement for extra pay was for duty at two specific locations. Testifying before a Subcommittee of the House Committee on Interstate and Foreign Commerce on H.R. 3379,[24] the Assistant General Counsel of the Federal Security Agency stated:

"MR. WILLCOX. Subsection (g) continues an existing provision of law, though with slight changes.

The present statute, which is found in 125, or [sic] title 42 of the code, relates to any commissioned or noncommissioned officer of the Public Health Service detained for duty at the leprosarium at Carville, La., or engaged in investigations of leprosy in Hawaii.

This section as drafted would include noncommissioned employees as well as noncommissioned officers. I take it that would mean lower grades. It would relate to any person, any such person, whose duties required him to be in close contact with persons afflicted with lepro-

---

17. Exec. Order No. 9993 was promulgated in 1948 and repeated both the above-quoted language and the "exclusivity" requirement. §§ 22.1, 22.2, 3 C.F.R. 780 (1943–1948).

18. The Order also added the requirement that the duty be for a period of 30 days or more, eliminated the differential in percentage increase that formerly applied to certain job categories, and reduced the maximum increment from 50 percent to 25 percent. Exec. Order No. 10354, 3 C.F.R. 873 (1949–1953).

19. Pub.L. No. 176, ch. 1443, 33 Stat. 1009 (1905) (formerly 42 U.S.C. § 121 *et seq.*).

20. Pub.L. No. 176, ch. 1443, § 7, 33 Stat. 1010 (1905) (formerly 42 U.S.C. § 125).

21. Pub.L. No. 299, ch. 26, 39 Stat. 872 (1917) (formerly 42 U.S.C. § 131 *et seq.*). The home referred to is, of course, the National Leprosarium at Carville, Louisiana.

22. Pub.L. No. 299, ch. 26, § 5, 39 Stat. 873 (1917) (formerly 42 U.S.C. § 135).

23. Ch. 373, § 611, 58 Stat. 714, 716–17 (1944).

24. H.R. 3379 was the precursor to H.R. 4624, the bill finally enacted as the Public Health Service Act of 1944, and is identical in all relevant respects.

sy, regardless of whether it may happen to be in Carville or in Hawaii." [25]

The primary purpose of Section 209(g) of the 1944 Act was thus to extend existing provisions of law to cover civil service employees. It is true that Congress in its wisdom did not confine the language of the statute by specific reference to Carville or Hawaii. But for purposes of assessing the propriety of the agency's construction of the statute and its own regulation, it is worth emphasizing that Congress' purpose in enacting the 1944 Act was to codify existing law, with minor changes. In the case of Section 209(g), the changes were to extend the extra pay provisions to civil service employees, and to make the amount of such pay, *if any,* discretionary with the President:

> "[Section 209(g)] would make a change, however, in that the present law gives an automatic 50 percent increase of pay to such persons. This bill would make the increase discretionary with the President, but not to exceed one-half of the pay." [26]

In any case, the 1944 Act was certainly not based on a congressional determination that all duty with Hansen's disease patients, at whatever sort of institution, is hazardous, though Chairman Bulwinkle was curious:

> "MR. BULWINKLE. Let me ask, Dr. Parran, just out of curiosity, have many [sic] members of the Public Health Service ever contracted leprosy?
>
> DR. PARRAN. I do not know of any who have contracted leprosy, Mr. Chairman.
>
> MR. BULWINKLE. How long have you had this service on your hands?
>
> DR. PARRAN. In Hawaii, since shortly after the Territory was acquired. At Carville, La., the Carville Institution has been in operation, I think, about 20 years. I am just told by Mr. Felton we recently have had one case of an employee of Carville who seemed to have developed leprosy." [27]

Given this background, it would certainly be reasonable for the agency to conclude that the leprosy pay provision in the 1944 Act was motivated by the same considerations as the analogous provision in the 1949 Act, namely, the necessity of offering incentives to persons working in institutions "devoted" or primarily dedicated to the care of Hansen's disease patients.

In that regard, the Court notes the anomaly plaintiffs' interpretation of the regulation would produce. Under the 1944 Act, commissioned officers cannot receive incentive pay at the USPHS Hospital in San Francisco since it is not a leprosarium. Were plaintiffs' construction of the regulation adopted, noncommissioned officers and civil service employees working side by side with these same commissioned officers would receive extra pay. The Court is reluctant to attribute such an anomalous intent to the Executive. It must be remembered that President Truman promulgated both Executive Order 10152, which first imposed the "leprosarium requirement" under the 1949 Act, and Executive Order 10354, which plaintiffs contend was promulgated for the purpose of including duty at general hospitals which treat leprosy patients under the 1944 Act. Administrative oversight is the only plausible explanation for leaving the two Orders unreconciled. In short, the agency interpretation of 42 C.F.R. § 22.1 is further buttressed by the fact that it is consistent with the regulations governing the 1949 Act, whereas plaintiffs' interpretation renders results under the two Acts which are completely incongruous.

■ For all the reasons discussed above, the Court finds that the determination that the USPHS Hospital in San Francisco is not "a station of the Service devoted to the care of leprosy patients" is neither plainly erroneous nor inconsistent with the regulation. It follows that plaintiffs are not entitled to extra pay under 42 U.S.C. § 210(e).

**25.** *Hearings on H.R. 3379 Before a Subcomm. of the House Comm. on Interstate and Foreign Commerce,* 78th Cong., 2d Sess. 90 (1944).

**26.** *Id.*

**27.** *Id.*

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

In *Davis,* defendants' motion for summary judgment is GRANTED and plaintiffs' motion for summary judgment is DENIED.

In *Levy,* plaintiffs' motion to certify the class is DENIED, and the Court, acting *sua sponte,* dismisses the action with prejudice. Defendants will prepare, serve, and lodge with the Court proposed judgments in each action in form approved by plaintiffs on or before March 15, 1978.